Markwell vs. Pereles and another.

MARKWELL, Plaintiff in error, vs. PERELES and another, Defendants in error.

*December 17, 1896 — March 16, 1897.*

*Parent and child: Custody of child.*

1. Sec. 3964, R. S., secures to a father, as the natural guardian of his minor child, the right to its care and custody, "if he is competent to transact his own business and not otherwise unsuitable," and the mere fact that its maternal relatives, who have had the care of the child from its birth and have become attached to it and desire to continue to care for it, are able to secure to it better advantages than can its parent, does not render that parent *unsuitable* to have its care and custody, within the meaning of that statute.

2. Nor is the father of the child rendered *unsuitable* by the fact that he is of a somewhat cold, reserved, and unsympathetic nature, or that, by reason of his occupation, he is absent from home the greater part of his time; or that his second wife, in whose care the child is to be in his absence, is young and has had little experience in the care and management of children, so as to authorize the court to deny him the care and custody of the child as against such relatives.

3. Whether or not the father might, by an oral contract, cede away his parental rights and finally conclude himself in respect to them, yet the mere facts that, when the father, at his wife's funeral, requested to be left alone with her remains, her brothers did not leave the room; that one of them there, in the name of his wife, requested the father to consent that they should have the custody of the child, and, on his remaining silent, asked him to shake hands if he would not speak, and he did take their hands; and that he afterward left the child in their care for twenty-one months, during which time he paid its expenses and constantly claimed the right to its custody, do not establish a surrender on the father's part of his right to the custody of such child.

ERROR to review a judgment of the circuit court for Milwaukee county: D. H. JOHNSON, Circuit Judge. *Reversed.*

This was a writ of error to review the order and determination of the circuit court for Milwaukee county in a proceeding by *habeas corpus*, brought by the plaintiff in error

in behalf of his infant daughter, Fannie P. Markwell, of
the age of about two years, and to procure her to be deliv-
ered to him by the defendants in error, the aunt and uncle
of said infant, in whose custody she then was. Proper re-
turn was made to the writ by the respondents, upon which
issue was taken by the petitioner.

The court ruled at the trial that the burden of proof was
on the respondents, and found the facts to be that the peti-
tioner was married to Julia E. Pereles, the sister of *James
M. Pereles*, one of the respondents, May 26, 1892; that the
child, Fannie, was born to them August 13, 1893, and that
its mother died October 14, 1893, at New York, where her
husband then and ever since has resided; that after the birth
of the child, its mother, while still ill, requested the respond-
ent *Jennie W. Pereles*, in case of her death, that she should
"take the said child into her care and custody," and that
the petitioner knew thereof and assented, or at least did not
object, thereto; that he voluntarily surrendered the custody
of said child to said respondents immediately after the death
of its mother; that they thereupon took the child into their
custody, and assumed the duty and responsibility of caring
for it as their own; that they understood at the time or
soon thereafter that it should remain with them until it ar-
rived at years of discretion, and that the petitioner, by his
words, acts, and conduct, sanctioned and approved such
understanding on their part until very recently, and that
they had had the exclusive care and custody of the child,
pursuant to such understanding, ever since the burial of its
mother, October 19, 1893; that the child has an affectionate
and highly nervous and sensitive disposition, and that it is
happy and contented in its present home with the respond-
ents, is greatly attached to them, who are in turn as much
attached to her as parents could be to their own child; "that
the petitioner, while of good moral character and business
habits, is *of a somewhat cold, reserved, and unsympathetic*

*nature, rather than warm hearted and affectionate, and has never exhibited much love or affection for said child;* that he is a traveling salesman by occupation, employed by a New York firm to sell goods on commission, from which he derives the greater part of his income, and in the course of his business must be absent from his home a great part of his time; that he remarried within the last thirty days, and his present wife is a young woman, who has had little or no experience in the care and management of children," and " is of no blood relationship to, and has had little or no acquaintance or intercourse with, the child;" that the respondents have a comfortable home in Milwaukee, are possessed of ample means, and are abundantly able and willing to care for, maintain, support, and educate said child at their own expense, so long as she may want a home, and to provide her with every material advantage of life; that to remove her from her present custody and home to the home of the petitioner in New York, to the custody to which she must there be committed, would be prejudicial to her best interests and welfare; that it is greatly to the advantage and best interests of said child that she remain with the respondents, at least until she arrives at years of discretion, and that the petitioner, *under all the circumstances of the case, is not a suitable person to have the care and custody of said child.*

And it was also found that he had demanded of the respondents, from time to time, statements of their disbursements for the care and custody of his child, and the wages of its nurse, paid by them, statements of which were rendered by the respondents, and paid by the petitioner.

The court dismissed the writ, and by its order remanded the child to the custody of the respondents until she should arrive at the age of fourteen years, when she might select her own custodian, and ordered that the petitioner should have the free and unrestricted right to visit said child in the

house of said respondents, or elsewhere, at all reasonable or proper hours, without insult, let, or hindrance on the part of the respondents, and that as a condition of the right of the respondents to retain the custody of the said child, as against the father's right of custody; the said *James M. Pere-les*, pay the petitioner all the moneys of which he had any knowledge, paid by the petitioner for the support and maintenance of said child since it came into their custody. There was no evidence tending to establish any other or different grounds for denying the petitioner the care and custody of his child than as are thus stated in the finding. Such other facts as are material will appear in the opinion.

For the plaintiff in error there were briefs by *Miller, Noyes, Miller & Wahl,* and oral argument by *G. H. Noyes* and *J. C. Spooner.* They argued that to justify a denial of the father's right to the care and custody of his infant child, there must be clear and satisfactory proof that he is unsuitable. *In re Goodenough,* 19 Wis. 274; *Johnston v. Johnston,* 89 id. 416; *In re Agar-Ellis,* L. R. 10 Ch. Div. 49, 71. He must have so conducted himself as to render it not merely better for the child, but essential to its safety or welfare in some very serious and important respect. *In re Flynn,* 2 De Gex & Sm. 457; *Weir v. Marley,* 99 Mo. 484, 494; *In re Scarritt,* 76 Mo. 565, 582; *Comm. v. Briggs,* 16 Pick. 205; *Lovell v. House of Good Shepherd,* 9 Wash. 419; *State ex rel. Sharpe v. Banks,* 25 Ind. 495. Even an agreement by the father giving to another the custody of his child will not prevent his subsequently reclaiming it. *Brooke v. Logan,* 112 Ind. 183; *Ex parte Clark,* 87 Cal. 638; *State ex rel. Hodgdon v. Libbey,* 44 N. H. 321; *State ex rel. Herrick v. Richardson,* 40 id. 272; *State ex rel. Mayne v. Baldwin,* 5 N. J. Eq. 454; *State v. Clover,* 16 N. J. Law, 419.

For the defendants in error there were briefs by *Winkler, Flanders, Smith, Bottum & Vilas,* and oral argument by *J. G. Flanders.* They contended, among other things, that

neither parent has any absolute right to the custody of a child; but the paramount consideration is, What do its best interests demand? *U. S. v. Green,* 3 Mason, 482; *Corrie v. Corrie,* 42 Mich. 509; *Mercein v. People ex rel. Barry,* 25 Wend. 64; *Clark v. Beyer,* 32 Ohio St. 299; *Bonnett ex rel. Newmeyer v. Bonnett,* 61 Iowa, 199; *Chapsky v. Wood,* 26 Kan. 650; *Gishwiler v. Dodez,* 4 Ohio St. 615; *Harris v. Harris,* 115 N. C. 587; *Sturtevant v. State,* 15 Neb. 459. A court will not restore the custody of a child to parents who have voluntarily relinquished it to others, unless on hearing all the facts it is of the opinion that the best interests of the child require it. *Legate v. Legate,* 87 Tex. 248; *In re Snook,* 51 Kan. 219; *Jones v. Darnell,* 103 Ind. 569; *Green v. Campbell,* 35 W. Va. 698; *Hussey v. Whiting,* 44 N. E. Rep. (Ind.), 639. A parent is not *suitable* to have the custody of his child, within the meaning of sec. 3964, R. S., if for any cause the welfare of the child requires that it be given to another. *Schiltz v. Roenitz,* 86 Wis. 31; *State ex rel. Flint v. Flint,* 63 Minn. 187.

The following opinion was filed January 12, 1897:

PINNEY, J. 1. By the common law, the father is considered as the natural guardian of his minor children, and entitled to their custody; and by the earlier cases his right to such custody could not be controlled by courts of law upon *habeas corpus,* but the court of chancery in England would interfere to control his paternal rights, and deprive him of the custody of his children, and to award it to some suitable person as guardian, where it was shown that he had forfeited his right by reason of gross ill-treatment, cruelty, or abandonment, or when his conduct and life were such as became injurious to the morals and interests of his children. 2 Story, Eq. Jur. § 1341; 2 Kent, Comm. *193. As a result of the duty to maintain, protect, and educate his children, the father is entitled to the custody of their persons, and to

their labor or services; but this right is not absolute.    This
right of the father, like any other right, may be lost or for-
feited by his misconduct; and in such cases courts of equity,
to promote the welfare and best interests of the children,
have taken them from him, and placed them in the custody
of others; and this jurisdiction is exercised in this country
in proceedings by *habeas corpus* affecting the custody of in-
fants.    *Dumain v. Gwynne*, 10 Allen, 271.    In *Comm. v.
Briggs*, 16 Pick. 205, it was said by SHAW, C. J., that "In
the case of a child of tender years, the good of the child is
to be regarded as the predominant consideration.    There
may be cases in which the court would not interfere, in favor
of the father, to take the child from any safe custody to
deliver it to him, as where he is a vagabond, and apparently
wholly unable to provide for the wants and safety of the
child.   .   .   .   And the court will feel bound to restore the
custody, where the law has placed it, with the father, unless
in a clear and strong case of unfitness on his part to have
such custody."    The relative rights of the parents to the
custody of their children, when they have separated and are
living apart, was very elaborately and fully considered and
discussed in the case of *People v. Mercein*, in its different
stages in the court of chancery, in the supreme court, and
in the court of errors, of New York, and the right of the
father to the custody of the minor children was sustained
substantially as stated.    *People ex rel. Barry v. Mercein*, 8
Paige, 47; 3 Hill, 399; *Mercein v. People ex rel. Barry*, 25
Wend. 64.

The question vital to this controversy depends, we think,
upon the proper construction and effect to be given to sec.
3964, R. S., which has been in force ever since 1849, pro-
viding that "The father of the minor, if living, and in
case of his death, the mother, while she remains unmarried,
being themselves respectively *competent to transact their own
business, and not otherwise unsuitable*, shall be entitled to the

custody of the person of the minor, and to the care of his education." R. S: 1849, ch. 80, secs. 5–7. It was held in *In re Goodenough,* 19 Wis. 275–277, that "If the father apply for the custody, the child should, if within the age of nurture, which is fixed at fourteen years, be delivered over to him, unless there is something in his situation or conduct which renders him unfit for the trust. *Prima facie,* the father is entitled to have his child delivered to him, unless there is enough shown in the return to rebut that right. The exception, as we have seen, is where it appears that the father is an improper person to have the care and management of the child." And the court quoted with approbation from *State v. Richardson,* 40 N. H. 272, to the effect that in determining this question the court will take into consideration the right of the father, his ability, inclination to perform faithfully the trust imposed upon him, the present condition of the child, and, if of years of discretion, its wishes upon the subject; and, furthermore, that "a proper regard to the sanctity of the parental relation will require that the objection be sustained by clear and satisfactory proofs." In the case of *Ramsay v. Ramsay,* 20 Wis. 507, which was a contest for the custody of a female child of the age of two years between its mother and its uncle, who had been irregularly appointed its guardian after the death of its father, the parents had separated. The wife was living with her father, and the husband had enlisted and died in the army; and testimony was given to the effect that the husband left the child with the defendant, his brother and its uncle, saying he wished him to take and bring it up as his own. Four other witnesses testified to similar declarations he had made at about the time he entered the army; that he had given his daughter, Libbie, to his brother, Robert, to take care of and bring her up as his own child. Evidence was given tending to show that the mother was an unfit person to have the custody of the child, but the court, COLE, J:, deliv-

Markwell vs. Pereles and another.

·ering the opinion, evidently written with this statute before
him, said: "There is no good reason shown for depriving
the mother of the care and custody of the child. It is an
infant female, about two years old; and on the death of the
father the mother became its lawful guardian. It may be
that the mother has no means to support and maintain the
·child, but this furnishes no just cause for depriving her of
its custody, and giving it to the paternal uncle. The guard-
ian by nature, on the death of the father, is the mother.
She has *the right* to the person of the child, unless it appears
that she is *an unfit person* to have control of it. An effort
was made to show that she was destitute of affection for her
·offspring, or was of so quick and violent a temper as ren-
·dered her *unfit or unsuitable* to have charge of the child.
The proof, however, fails to establish any such case. It does
not show that her character or conduct has been such that
a court would be authorized to interfere and deprive her of
the care and custody of this infant child." And she had
judgment in her favor. The subsequent case of *Sheers v.
Stein*, 75 Wis. 50, is in substantial accord with the cases al-
·ready cited, and it was there held that the statute leaves
·open " the inquiry as to the suitableness of the parent to
have the custody of the child," and in that immediate con-
nection the opinion of the court states that it seems quite
·obvious " that if, for any cause, the welfare of the infant
demands that its care and custody be withheld from the
parent, and given to another, the parent is not a suitable
person, within the meaning of the statute. It was so held,
in effect, in *In re Goodenough*, 19 Wis. 274; yet it was held
·on *habeas corpus* that it was within the sound discretion of
the court or officer to change the custody of an infant of
tender years, and that sufficient appeared to justify the
exercise of such discretionary power in that proceeding by
refusing to give the custody of the child to the petitioner,
who was its father. The refusal *went upon the ground* of

the bad character of the father; but manifestly the same rule is applicable if any other valid *cause of unsuitableness* exists." This is all that, in point of law, was decided in that case, and the court refused the father the custody of his child solely on the ground of his *unsuitableness* for its care and custody; and the child was remanded to the care and custody of the respondents, because of their suitableness for the trust.

Certainly the court did not decide, or intend to intimate, that the suitableness of the respondents for the care and custody of the child constituted *per se*, or tended to show, unsuitableness on the part of the father; for it is entirely clear that the statute is not susceptible of so absurd a construction as to permit the custodian to withhold from the father the custody of his child, when he was not unsuitable to care for and educate it, simply because such custodian was equally, or perhaps more, able or competent. Such a ruling would be destructive of parental rights and authority, and subversive of social order, founded so largely on the sanctity of the home and family relations. In the subsequent case of *Schiltz v. Roenitz*, 86 Wis. 31, 37, it was said, after quoting the statute, that "the statute intervenes only upon the destitution and necessity of the child, and in all cases of controverted right to its custody its welfare is a matter of primary consideration," and is especially applicable to cases such as *Johnston v. Johnston*, 89 Wis. 416, which was a controversy between the parents who had separated and were living apart, for the care and custody of their children (and such are many of the cases relied on by the respondents), and where the right of the father was affirmed, if he was not an unfit person for the trust; but, it being conceded that he was unfit, it was held that the court rightly refused, at his request, to take them from their mother, in order to give them to their paternal grandfather, who was wealthy, and evidently attached to them, and had done

much for their support in the past; that the mother, not being unsuitable, was not to be deprived of their care and custody, or the children of her companionship or affection, because she was in straitened circumstances, although their paternal grandfather was willing at that time to give them better advantages in life than those to which they were born. The decisions in this state under this statute are, we think, in substantial accord, and must be regarded as holding that the statute secures to the father, as the natural guardian of his child, the right to its care and custody, if he is competent to transact his own business and not otherwise unsuitable; and that he is not rendered unsuitable by the fact that there are those attached to the child, having or desiring its care and custody, who occupy a higher position in the social scale, or are able to give or secure to it advantages in life better than those of the station to which it was born. We feel bound to follow the plain, obvious meaning of the statute, and the construction placed upon it, whatever may have been held in other jurisdictions in the absence of statutory provision.

2. The trial court found, in substance, that the petitioner was of good moral character and business habits, and that he was competent to transact his own business. The evidence abundantly established it. Do the findings show that he was " otherwise unsuitable " to have the care and custody of his child? The only finding that imputes to him unsuitableness is to the effect that " he is of a somewhat cold, reserved, and unsympathetic nature, rather than warm hearted and affectionate, and has never exhibited much love or affection for said child; that he is a traveling salesman by occupation, . . . and in the course of his business must be absent from his home a great part of his time." This presents the question whether it may properly be held, as a matter of law, that a father, described and circumstanced as stated, is *unsuitable* to have the care and custody of his

Markwell vs. Pereles and another.

child, and may, therefore, be deprived of his parental rights; and that none but the warm hearted and affectionate, who are effusive and demonstrative in their parental affections, are to be protected in the enjoyment of such rights. Profuse and constant professions of love and affection are often empty and delusive; while beneath a quiet and dignified reserve the current of a warm and devoted affection is constant and active. The petitioner has now a home and another wife, against whom no objection has been made, save that she is young and has had little or no experience in the care and management of children. Are the parental rights of a father, who, by reason of his occupation, is absent from his home the greater part of his time, entitled to no consideration, so that in such a case he may not have the care, custody, and presence of his infant daughter to gladden and make it cheerful? We cannot regard any or all of these specifications of unsuitableness as amounting to such under the law, or as furnishing any ground whatever for denying to the petitioner his sacred rights of paternal custody, companionship, education, and control; and we think that to hold that these findings show that the petitioner is unsuitable to have the care and custody of his infant child would be to give a serious blow to the most universal and tender of all natural relations, and to the security and sanctity of family ties. The finding is further that to remove said child from its present custody to the home of her father in New York, *to the custody* to which it must be committed, that is to say, to the custody of her father, who is not really unsuitable for the trust, would be prejudicial to the best interests and welfare of the child, without other specific finding of fact going to show his personal unsuitableness, and that "under all the circumstances of the case the petitioner is not a suitable person to have the care and custody of the child." The other facts referred to, we must presume, are the other facts specifically found, and sufficiently stated

above.   These views as to parental rights, and as to what
constitutes unsuitableness to have the care and custody of
children, are in accord with, and sustained by, recent de-
cisions of the highest courts of England.   *In re Agar-Ellis*,
10 Ch. Div. 49; *In re Newton* [1896], 1 Ch. Div. 740–749.
In *In re Fynn*, 2 De Gex & S. 457, it was declared that
"A man may be in narrow circumstances; he may be neg-
ligent, injudicious, and faulty as the father of minors; he
may be a person from whom the discreet, the intelligent,
and the well-disposed, exercising a private judgment, would
wish his children to be, for their sakes and his own, removed;
he may be all this without rendering himself liable to judi-
cial interference, and in the main it is for obvious reasons
well that it should be so.   Before this jurisdiction can be
called into action between them, it must be satisfied, not
only that it has the means of acting safely and efficiently,
but also that the father has so conducted himself, or has
shown himself to be a person of such a description, or is
placed in such a position, as to render it not merely better
for the children, but essential to their safety or to their wel-
fare, in some very serious and important respect, that his
rights should be treated as lost or suspended,— should be
superseded or interfered with.   If the word 'essential' is
too strong an expression, it is not much too strong." *Reg.
v. Gyngall*, 4 Reports, 448–454; *In re Goldsworthy*, 2 Q. B.
Div. 75.   We hold, therefore, that upon the facts appearing
of record and found the order and determination denying
the petitioner the relief prayed for is erroneous.

3. An examination of the facts in the case leads us to the
same conclusion.   Without adverting to the many minor
matters of no material weight, and which appear to have
been so regarded by the trial court, the salient facts, in
brief, are: That the petitioner had had a very considerable
experience in mercantile affairs, and was, and had been for
several years, engaged as a traveling salesman for a firm in

Markwell vs. Pereles and another.

New York, upon a salary of $7,500 per annum, and required to make two trips each year, of about six or eight weeks' duration each, to the Pacific coast.   The rest of the time he was engaged in New York.   And he received some income from other sources.   After the marriage of the petitioner to Julia E. Pereles, they went to New York to live, and then to Bayswater, Long Island, where they remained until September, 1892.   While there, she was taken suddenly and seriouly ill, and her life was despaired of; but, after her recovery, she, with her husband, visited Milwaukee, and she remained with the respondents while he made his western trip, and then they returned to New York, where they resided until her death.   He had delayed his western trip in the fall of 1893 three or four weeks on account of the birth of the child, and when he left for the Pacific coast, his wife's health had been fully restored, so that physicians advised him there was no danger in his going.   Her death was the result of a very sudden attack, which terminated fatally in about forty-eight hours.   He received the intelligence by telegram October 14th, and immediately started for Milwaukee, arriving there on the 18th, meeting T. J. Pereles at Chicago, who, with the respondent *Mrs. James M. Pereles*, and the child and its nurse, were on the way to Milwaukee, with the remains of the deceased.   The funeral occurred the next day from the residence of the respondent *James M. Pereles*.   At the conclusion of the services, the petitioner requested to be left alone with the remains, and every one left the room but the respondent *James M. Pereles*, and his brother, T. J. Pereles.   The former then said to the petitioner, as he testified, " Now, *Nathan*, before we remove all there is left to us of our sister, I ask you at the bier of your wife to say that we three take care of Fannie, the only baby ; and *Jennie*, my wife, shall have the care and custody of that little darling."   He did not answer, and respondent then said, "If you cannot speak, let us shake hands."   That the

Markwell vs. Pereles and another.

three then shook hands, and then he, *James M. Pereles*, and his brother went out of the room. A few days thereafter T. J. Pereles insisted on the petitioner signing papers, putting this in writing, or having a guardianship, and the petitioner said he thought it was not necessary to have a guardian, and *James M. Pereles* said he thought not; that he was willing to take *Nathan's* word. That of course he "had in mind the promise at the coffin." That afterwards, in January, the petitioner said that "We want to be friends, and want to carry out our arrangements about the child,— the custody of the child." What I have in mind, as I understood it, "was in reference to the arrangements we had made at the death of my sister." T. J. Pereles' testimony was in substance the same as his brother's in respect to what took place at the bier of the deceased wife. He testified as to the suggestion that *James M. Pereles* be appointed guardian of the child, and that, "after considering the matter, *Mr. Markwell* refused to consent." In the July following, the petitioner, in a letter, claimed the right to the custody of the child, and in October, 1894, he made claim for it, but said he would not take her away then. He then said, as *James M. Pereles* testified: "If I want to get married, I want to get the child. Don't you think I have a right to the child?" And witness replied, "Yes, under certain circumstances you have; but in this case I don't think you have." He said, "Has not the father a right to the child?" Witness replied, "The father has as good a right if he lives in a hovel as if he lives in a mansion." He said, "If I get married, haven't I a right to the child?" Witness replied: "We won't cross a bridge until we get there. Under our arrangement, you are not entitled to *our* child, and we want to live up to our arrangement."

The petitioner testified as to the occurrence after the funeral services; that he asked to be left alone with the remains; that both the *Pereles* brothers remained, and said something

Markwell vs. Pereles and another.

at that time, and that all he remembered that was said, and on which he may have given his hand to them, was, "Let us be uncles and aunts to this child always;" that he did not remember that *James M. Pereles* said words to the effect that the three should take care of the child, and that *Mrs. Pereles* should have the custody of it, but he did remember that they said something, and that he remained silent, and afterwards, when they extended their hands to him, he took them; that a day or two after the burial, T. J. Pereles proposed that *James M. Pereles* should be appointed guardian of the child, and he promised to think it over, and that nothing was said in January about the custody of the child; that he stated to them in October, 1894, that he had come to take his child, but, after due consideration and advice of friends, he had concluded to leave it for the time being, but told them that at some future time he might be able to offer it a home, and then he should certainly desire his child to live with him, and to bring it up; that the next conversation on the subject was in October, 1895, when he was referred by *James M. Pereles* to his wife, one of the respondents (there having been some previous correspondence on the subject). He told her he should come for the child about November 20, and she refused to give it up. On November 12, 1895, the petitioner was married to his second wife, a lady of the age of about twenty-eight years. On the 19th of the same month his wife went to Milwaukee with him, and he called on both respondents; but *Mrs. Pereles* said she had not changed her mind.

The respondent *Jennie W. Pereles* testified to a conversation with the mother of the child, after its birth, when she urged witness, and said, "*Jennie,* if ever anything happens to me, will you take care of my baby?" And that she told her she would, if that was any satisfaction to her, but she was perfectly healthy under the circumstances of the case; that she told her she must not think of these things, but, if

it was any comfort to her, she would promise to take it.
Dr. G. D. Ladd, on the part of the respondents, testified
that he had practiced for twenty years, and to his knowl-
edge of the child, and to having been called upon to attend
her; that she was a nervous and excitable child, and the
effect of transferring her from the home of the respondents
to another home presided over by strangers, would be to
temporarily excite and disturb her, until she became estab-
lished and acquainted with the new home; the after-effect
would depend upon what the home was; and that she was
ordinarily healthy and strong, and enjoyed good health while
in his care; that she would be some time in forgetting those
who had her in charge, but that a child of that age (some-
what over two years) does not form such strong attachments,
even to its parents, but that it would change; that she was
physically and mentally able, and could, with proper care,
be transferred from Milwaukee to New York, and not injure
her health. On the part of the respondents there was pro-
duced the testimony of eight ladies who knew the child and
the respondents, showing that in their opinion the child was
and had been well cared for, and could not have a better
home than that of the respondents, and that they were very
much attached to it, and that it was a very lovable child;
that they had no acquaintance with or knowledge of the
petitioner, and gave their opinion to the effect that it would
be for the advantage of the child to remain where she was;
that a change of custody would produce a shock to the nerv-
ous system of the child. Some were quite decided, others
were reserved and cautious in their opinions as to the prob-
able effect of the change. Some thought the change would
be harmful, and some based their opinion upon the nervous
and sensitive nature of the child.

It further appeared from the testimony of the petitioner
that after his second marriage he rented a house in New
York for $1,200 a year, which was ready for occupancy, and

provision had been made for furnishing it as a home for himself and wife, and that it was in as healthy a locality as any in the city; that he visited the child in Milwaukee twelve times after the death of his wife, before this writ issued, and it appears that he had made it various presents,— toys, articles of clothing, etc. Over 160 letters and a few telegrams from the petitioner to one or the other of the respondents were produced and put in evidence, which were all written within the course of about two years, and they abounded in expressions of love, affection, and tender solicitude for his child. He expressed himself as pleased with the attention, care, love, and affection extended to her, and the home his child had, and that she could have no better; that it was more than fortunate that it was possible for her to have such a home.

We cannot give our assent to the conclusion that what took place between the parties at the close of the funeral services ought to be regarded or enforced as a binding contract, precluding the petitioner from thereafter claiming the care and custody of his child, even if it be conceded, as a matter of law, that the father might, by an oral contract, cede away his parental rights, and finally conclude himself in respect to them,— a proposition denied by the great weight of authority. *Brooke v. Logan*, 112 Ind. 183; *Ex parte Clark*, 87 Cal. 638; *Weir v. Marley*, 99 Mo. 484; *In re Stockman*, 71 Mich. 199; *State v. Libbey*, 44 N. H. 321; *State v. Richardson*, 40 N. H. 272. In these cases, the questions here discussed in relation to the rights of the father to the care and custody of his infant children are fully considered, and many authorities are cited. The petitioner had asked to be left alone in the room with the remains of his wife, about to be taken to the place of burial. The brothers, however, remained, and at that juncture, and in the painful and solemn presence of his dead wife, he was asked to give away the care and custody of all that remained of his little

family.  What could he have properly said or done on that occasion?  What remained to him but silence, and could he be expected to decline to take the offered hands of the brothers?  While he spoke no word, it seems to be insisted that by this occurrence, and by leaving his child in the care and custody of the respondents for a period of about twenty-one months, until he regained another home, he had surrendered or lost his parental rights in respect to his infant daughter.  We are unable to conclude from this occurrence, or from any evidence in the record, that any such conclusion can be properly drawn.  As already stated, he insisted on his parental rights at different times, and quite distinctly. There is no reason to think the respondents did not understand his position and claim.  There is no material conflict of evidence in the vital questions in the case, and the question is, what conclusion ought to be drawn from the practically conceded facts.  We think that the main conclusions of fact arrived at by the circuit court are not warranted and sustained by competent evidence, and that upon uncontradicted evidence no legal reason has been shown to exist why the petitioner should not now have the care and custody of his child.  The evidence is not sufficient, we think, to justify any reasonable apprehension of harm or injury to the child in transferring her custody from the respondents to the petitioner, or that it would be prejudicial to the interests and welfare of the child.  The judgment of the circuit court is erroneous, and must be reversed.

*By the Court.*— The order and judgment of the circuit court is reversed, and the cause remanded to that court, with directions to award the care and custody of the infant child, Fannie P. Markwell, to the said petitioner.

A motion for a rehearing was denied March 16, 1897.