STATE EX REL. TUTTLE, Respondent, vs. HANSON and wife, Appellants.

*December 5, 1956—January 7, 1957.*

424

For the appellants there was a brief and oral argument by *Robert Zum Brunnen* of Spooner.

For the respondent there was a brief and oral argument by *Ward Winton* of Shell Lake.

CURRIE, J.   Both secs. 252.15 (4) and 292.03, Stats., vest in court commissioners the power to issue writs of *habeas corpus*. Sec. 23, art. VII of the Wisconsin constitution provides that the power of a court commissioner "shall not exceed that of a judge of a circuit court at chambers," and a similar restriction is to be found in sec. 269.29 (formerly sec. 2815), Stats. In *Longstaff v. State* (1904), 120 Wis. 346, 97 N. W. 900, this court determined that such restrictions did not bar a court commissioner from *hearing and determining* in a *habeas corpus* proceeding whether a prisoner was imprisoned contrary to law. Subsequently it was held in *Potter v. Frohbach* (1907), 133 Wis. 1, 112 N. W. 1087, which was a *habeas corpus* proceeding instituted by a father to obtain custody of his two minor children, that both a court commissioner and a circuit judge at chambers have jurisdiction in such a proceeding to *hear and determine* the questions that may appropriately be presented for adjudication.

Inasmuch as a court commissioner has jurisdiction to take testimony and make an order determining custody in a *habeas corpus* proceeding instituted before him, the first question which confronts us is the scope of review vested in the circuit court. The applicable statute is sec. 269.29, which provides that orders of a court commissioner "may be reviewed by the [circuit] court." The learned circuit judge, in his memorandum opinion, held that such review extended beyond jurisdictional errors and stated, "We are of the opinion that the circuit court, in a case like this, has a right to review

the matter based upon the evidence and findings, and *if it thinks from the findings,* a different judgment should be entered, it has a right to do so." (Emphasis supplied.)

Such quoted statement fails to state the weight, if any, which the circuit court must accord to the findings of fact of the court commissioner. It will be noted that the circuit judge did not assert the right of the circuit court to enter a different judgment if the judge thinks from the evidence that this should be done. The express reference to *"the findings"* of the commissioner we deem to be significant. This seems to imply that some weight must be accorded such findings on the review in circuit court, and that the rationale of the circuit judge's decision was that the commissioner's findings did not support the order.

The opinion in the case of *Potter v. Frohbach, supra,* lays down the rules of procedure to be followed in the circuit court for challenging action of a court commissioner in *habeas corpus.* Certain of these relate to jurisdictional error with which we are not here concerned, but the rule applicable to the instant case is stated as follows (133 Wis. at p. 5):

"To review the action of a court commissioner for mere judicial error, an ordinary motion in the proceeding in the circuit court for that purpose is the proper method of invoking the superior judicial authority."

None of the rules laid down in *Potter v. Frohbach, supra,* would permit the circuit court to disturb a court commissioner's order entered in a *habeas corpus* proceeding in the absence of the commission of error by the commissioner.

We consider that the decision of the Massachusetts court in *Swan v. Justices of the Superior Court* (1916), 222 Mass. 542, 543, 546, 547, 548, 111 N. E. 386, is also in point on the proper interpretation of the word *"review"* appearing in sec. 269.29, Stats. The court had before it a statute that authorized the mayor of a city to remove members of a licensing board for cause, and which granted to a board mem-

ber so removed the right to apply to the superior court "for a *review* of the charges, of the evidence submitted thereunder, and of the findings thereon by the mayor." The superior court held that in conducting a review under such statute "that the finding of the mayor as to facts must stand if supported by reasonable evidence, and that it is not sufficient to overthrow such finding that the court might feel that a consideration of the evidence uncontrolled by the finding might lead to a different result." The supreme judicial court approved of such interpretation of the statute as being a "sound view as to the meaning of the statutory words." Such court also stated that a "review indicates simply a re-examination of proceedings already had" without the taking of any new evidence.

We are constrained to hold that a circuit court has no power under sec. 269.29, Stats., to reverse an order entered by a court commissioner in *habeas corpus* proceedings except for error. The weight to be accorded the findings of fact made by a commissioner in such a proceeding is the same as this court gives to the findings of fact made by any trial judge, viz., they must stand if not against the great weight and clear preponderance of the evidence. If the court commissioner enters a finding of fact which is against the great weight and clear preponderance of the evidence he has committed error which the circuit court is empowered to correct on review.

A careful reading of the memorandum decision of the circuit judge, and of the findings of fact and conclusions of law entered in the circuit court, does not disclose that his view of the scope of review under sec. 269.29, Stats., differs in any respect from our own as above stated. While the findings of fact pointed out certain advantages to the child, which would result from transferring custody to the father, there was no express finding that it was for the best interests of the child to so transfer custody. The basis assigned in the

memorandum opinion for reversing the order of the court commissioner was that the father, being competent and not unfit, was as a matter of law entitled to have the custody of his child.

Counsel for the respondent father contend that sec. 319.03, Stats., is controlling of the result here. Such statute provides that "in case of the death of either parent the survivor being competent and suitable, shall be entitled to the custody of the minor, . . ." There is no question but under the findings of fact of the court commissioner that the father, Robert Tuttle, is competent and that he is a fit person to have the custody of Teri. The statute confers no rights of custody whatever on the grandparents, and, therefore, if the welfare of the child is not to be considered, there would be no question but that the surviving parent's right of custody would prevail as against grandparents or other relatives. *Markwell v. Pereles* (1897), 95 Wis. 406, 69 N. W. 798.

However, not only may not the welfare of the child be ignored in a situation like the present, but such welfare is the paramount consideration which must govern. Such principle was first enunciated by this court in *Sheers v. Stein* (1889), 75 Wis. 44, 43 N. W. 728, in a memorable opinion by Mr. Justice LYON. Present sec. 319.03, Stats., was then sec. 3964, R. S. 1889, and, while then worded somewhat differently, it did provide that a father who was competent *"and not otherwise unsuitable"* was entitled to the custody of his minor child. The court had before it in that case a *habeas corpus* proceeding instituted by the father to obtain custody of his minor daughter, and the court in its opinion construed sec. 3964, R. S. 1889. We quote from the opinion in that case as follows (75 Wis. at p. 51):

"It is now well settled, at least in this country, that although *prima facie* the father is entitled to the care and custody of his infant child, yet, if he be an unfit person therefor, or if it be for the welfare of the child that its nurture be com-

mitted to another, the court before which the matter is pending on *habeas corpus* may, in the exercise of a sound judicial discretion, deny such custody to the father, and give it to another. . . .

"The exercise of such discretion in a proper case is not inconsistent with the following provisions of sec. 3964. R. S., which are much relied upon by counsel for petitioner: [Quoting statute]. This statute leaves open the inquiry as to the suitableness of the parent for that purpose; and it seems quite obvious that *if, for any cause, the welfare of the infant demands that its care and custody be withheld from the parent and given to another, the parent is not a suitable person to have such care and custody, within the meaning of the statute.*" (Emphasis supplied.)

It must be conceded that decisions subsequent to *Sheers v. Stein, supra,* have not followed a consistent pattern and there was some departure therefrom. However, we do not consider that the word *"suitable"* appearing in present sec. 319.03, Stats., is synonymous with *"fit."* As employed by our courts in custody cases the word *"fit"* connotes moral rectitude. The word *"suitable,"* while embracing moral fitness, is broad enough to include all policy considerations which should be weighed by the court in determining child-custody placements, including the best interests of the minor. Therefore, the view expressed by Mr. Justice LYON in the *Sheers Case,* that a parent is not suitable to be awarded custody of a child if to do so would not be for the best interests of the child, should be adhered to. We consider that the cases of *Jones v. State ex rel. Falligant* (1933), 211 Wis. 9, 17, 247 N. W. 445, and *Edwards v. Edwards* (1955), 270 Wis. 48, 56a, 70 N. W. (2d) 22, 71 N. W. (2d) 366, support such conclusion.

Mr. Chief Justice ROSENBERRY, speaking for the court in *Jones v. State ex rel. Falligant, supra,* stated (211 Wis. at p. 17):

"As we have said in many cases, the primary consideration in cases involving the right to the custody of a minor child

is the welfare of the child. The so-called 'right' of parents must yield when the exercise of that right will be detrimental to the child's interest. It is not a right to be vindicated in the law as the possession of a chattel should be.".

The court commissioner made a specific finding of fact that the best interests of Teri require that she remain in the home of her grandparents, the Hansons. No error of law was, therefore, committed by the commissioner in ordering that the custody of Teri remain with the Hansons, if such finding may not be disturbed on review.

The circuit court made no determination that such finding of fact was against the great weight and clear preponderance of the evidence. We could rest this opinion at this point because respondent's brief does not directly challenge the court commissioner's findings of fact, although it does marshal facts to support the position taken that the transfer of custody ordered by the circuit court is in the best interests of Teri. Under such circumstances we deem it to be our duty to examine the testimony in the record and determine whether the commissioner's findings of fact are against the great weight and clear preponderance of the evidence.

Robert Tuttle, the father of Teri, has a good position and has an income of approximately $11,000 per year. He is thirty-five years of age and his present wife is thirty years of age. Mr. and Mrs. Tuttle reside at Whittier, California, a city of approximately 75,000 population where they own a modest two-bedroom home. No children were born of this second marriage which occurred in 1947. In 1951 Mrs. Tuttle left her husband but later they were reconciled and she went back to live with him. He has relatives in Spooner and has returned there for visits of an average duration of two days each four or five times since his divorce from Teri's mother. During such visits he never called at the Hanson home to see Teri although there had been no disagreement between him and the Hansons, and the Hansons had always

spoken well of him to Teri. The only time that he saw Teri on these visits to Spooner was an accidental meeting with her in a drugstore. In recent years he has sent Teri Christmas and birthday presents but has never written a letter to her.

Teri has resided with her grandparents, the Hansons, ever since she was eight months old. The Hansons own their home in Spooner and a summer cottage in Bayfield county, and Teri has her own separate bedroom. At the time of trial Mr. Hanson was seventy years of age and Mrs. Hanson was sixty-eight years of age and both were in good health. He is a retired railroad conductor and draws a monthly pension of $277.77 per month. They attend the Trinity Lutheran Church in Spooner and Teri regularly attends Sunday school there and had done so for the three years preceding the hearing. The public school attended by Teri is but six and a half blocks from the Hanson residence. She gets good marks in school.

Arthur Golden, the school principal, testified that Teri has been in his home on an average of once a week because Teri is a close friend of his older daughter. He considers Teri to be a happy, well-adjusted child, immaculately clean, and an exemplary young lady. Joella Anderson, Teri's Sunday school teacher, testified that Teri is a well-behaved and well-liked child.

Dr. Moen, a physician and surgeon residing at Shell Lake, has known Teri for at least eight years, and it is his opinion that she is a normally healthy child. He treated her professionally only a few days before the hearing for abdominal cramps due to a nervous bowel. He asked Teri what she was disturbed about, and she told the doctor that she did not want to change her residence to her father's home in California. The doctor said that he also realized that she was bothered by the death of her mother which had occurred about three weeks before. The following questions were asked the doctor and he gave the following answers thereto:

"*Q.* Do you have an opinion on how the removal of her to her father's home might affect this child? *A.* Teri is eleven years old, in a very formative stage of life, as far as mental, nervous, and physical developments are concerned. It may be injurious to cause too much disturbance in their nervous reactions. This [is] her home and displacing a child at the age of eleven years should be taken seriously. She has a mind of her own and she has some opinions and displacing her against her wishes is to be taken seriously. Displacing an infant makes no difference. This girl is disturbed about being moved and it is to be taken seriously.
"*Q.* Do you think there is the possibility that her personality would be harmed if she were removed at this time? *A.* Yes, I think there is that possibility."

Dr. Moen also testified that Teri is now at a critical age when it would be the hardest for her to cope with a change of residence; and that if she were of the age of fifteen to eighteen it would be easier for her to make the adjustment. On cross-examination, he was asked this further question and gave this answer thereto:

"*Q.* We may be getting into a psychological field but the testimony of a social worker was, so far as social adjustments were concerned, that a teenager would find it harder to adjust than a younger child. *A.* I would agree with no generalization on such a statement. This girl at the age of eleven is very disturbed. It is this child we are considering and not the general statement of any teenager. This child is probably now as disturbed as the social worker's discussion of a teenager. It is an individual problem."

In *Jones v. State ex rel. Falligant, supra,* this court had before it a case where parents endeavored through *habeas corpus* to obtain custody of a fourteen-year-old girl who had lived practically her entire life with grandparents who were then of the ages of sixty-nine and sixty-two years. This court in its opinion stated (211 Wis. at p. 17):

"The trial court quite rightly attaches some importance to the age of the grandparents. However, the time is not far

■■■■■

distant when this girl or young woman will take charge of her own life, whatever the decision of this court may be."

Under all probabilities Teri will be of the age mentioned in the foregoing quotation when the death of the Hansons does occur.

Teri's mother was killed while riding on the fender of an automobile driven by a man not her husband. The commissioner commented in his memorandum opinion, with respect to Mrs. Stouffer's testimony, that it would be best for Teri to be removed from Spooner because of the notoriety resulting from her mother's death, as follows:

"Teri has, at an early age, an excellent standing in the community and people generally will accept her for what she is, regardless of the reputation of the mother. Teri has been fully accepted in the past, regardless of what the community knows of some of the principals in the case."

It strikes us that the foregoing comment accords with common experience. The critical period when the mother's misconduct and unfortunate death were the subject of local comment has in all likelihood long since passed. The opinion of an experienced county judge, as was the commissioner in this case, as to the possible adverse effect upon the child, if she continued to reside in the community, of the notoriety arising from the death of the mother, would seem to be entitled to as much weight as is the opinion of a social case worker.

This court on the basis of the foregoing summary of the evidence certainly cannot hold that the court commissioner's finding of fact, that the best interests of Teri require that she remain in the custody of the Hansons, is against the great weight and clear preponderance of the evidence. In weighing evidence in these custody cases due consideration should always be given to the fact that the judge or commissioner, whose findings are at issue, saw and heard the witnesses who testified. In the instant case that was an

advantage which neither the circuit court nor this court possessed.

*By the Court.*—Judgment reversed, and cause remanded with directions to affirm the findings of fact, conclusions of law, and order of the court commissioner.

STEINLE, J. (*dissenting*). The court commissioner did not find that the father was unfit to have the custody of his ten-year-old child, but determined that it would be for the child's best interests that she remain in the home of the grandparents. Such determination of best interests appears to have been based wholly on considerations that the child had lived with the mother in the home of its grandparents from the age of eight months until the mother remarried, and that the child continued to live in the grandparents' home after the mother had remarried and had removed from there, the mother, however, retaining legal custody; further, that the child was presently nervous and disturbed because of the death of the mother, and the notoriety attending the circumstances of her death, and also the realization that she might be changed from the home she grew up in; further, that the child preferred to remain with the grandparents. The many cases determined by this court from early times to the present involving custody applications under sec. 319.03, Stats., or legislation similar thereto antedating that enactment, indicate that the term "suitable" as contained in the provision "in case of the death of either parent, the survivor being competent and *suitable,* shall be entitled to the custody of the minor, and to the care of his education," has been interpreted to mean that the parent be not unfit to be intrusted with custody, and that a change of custody to the parent would not result in injury to the child's welfare or safety. In *Lemmin v. Lorfeld* (1900), 107 Wis. 264, 266, 83 N. W. 359, Mr. Justice WINSLOW in a review of the principles laid down in *Markwell v. Pereles* (1897), 95 Wis. 406, 69 N. W. 798, pointed out that:

"Under the common law, and by the terms of our statute (sec. 3964, Stats. 1898), the father has the right to the custody, care, and education of his minor children, unless it be shown that he is unfit or unsuitable for the trust. Unsuitableness is not to be found merely because the father may be in straitened circumstances, or may not be as discreet or judicious as could be wished, nor because other persons, of greater means or better social standing, stand ready and willing to take the child and give it greater advantages. If such were the test, the father's right would be reduced to a mere shadow, of the most unsubstantial character. But it must appear that the father has 'so conducted himself, or shown himself to be a person of such description, or is placed in such a position, as to render it not merely better for the children, *but essential to their safety or to their welfare,* in some very serious and important respect, that his rights should be treated as lost or suspended,—should be superseded or interfered with.' " (Emphasis supplied.)

In *Markwell v. Pereles, supra,* at page 415, the court said:

"The decisions in this state under this statute are, we think, in substantial accord, and must be regarded as holding that the statute secures to the father, as the natural guardian of his child, the right to its care and custody, if he is competent to transact his own business and not otherwise unsuitable; and that he is not rendered unsuitable by the fact that there are those attached to the child, having or desiring its care and custody, who occupy a higher position in the social scale, or are able to give or secure to it advantages in life better than those of the station to which it was born."

See also *Guardianship of Bare* (1920), 170 Wis. 543, 174 N. W. 906, and *Custody of Collentine* (1934), 214 Wis. 619, 254 N. W. 118.

On the basis of the record in the instant cause I am of the view that the court commissioner's findings are against the great weight and the clear preponderance of the evidence, and that as a result there was error which the circuit court properly corrected by its judgment. With respect to the father's fitness, although it was challenged at the trial before

the commissioner and at the trial in the circuit court, it stands of record as being satisfactory. The medical testimony adduced on behalf of the grandparents indicates beyond doubt that the nervousness of the child and the disturbances heretofore referred to, are temporary. There is no medical or other evidence to indicate that the child would not in a very short time adjust to a happy life in the home of her father. At the ages of these grandparents (in accordance with modern standards), it is neither for the best interest of the child nor themselves that they undertake the continued care and training of the child. The record shows without dispute that should illness or death come to either of the grandparents before the child attain the age of eighteen years, it would be far more difficult for the child to adjust to a changed home environment than it would be now. Although the child expressed a preference to remain with the grandparents, it does not appear that the same is more than a personal choice, and that it does not include substantial reasons why it would be against her best interests to be compelled to reside with her father. As to this last item, the situation is controlled by the principle elucidated in *Edwards v. Edwards* (1955), 270 Wis. 48, 56b, 70 N. W. (2d) 22, 71 N. W. (2d) 366, where in a *per curiam* opinion on motion for rehearing this court said:

"In the instant case, if Franklin Edwards, Jr., does testify that he prefers to remain in the foster home where he has resided for some years rather than return to the custody of his father, such fact should not be deemed to be controlling on the issue of custody unless the testimony of the boy goes beyond this matter of personal preference and gives substantial reasons why it would be against his best interests to be compelled to reside with his father."

In my opinion the judgment of the circuit court ought to be affirmed.