Hanley, J.
 

 Three issues are presented on this appeal:
 

 1. Did the trial court abuse its discretion in denying the appellants’ motion for continuance ?
 

 2. Did the trial court erroneously accord substantial weight to the natural father’s nomination of a guardian in reaching a decision?
 

 3. Was the trial court’s choice of guardians an abuse of discretion as contrary to the great weight and clear preponderance of the evidence concerning the best interests of the children?
 

 Denial of continuance.
 

 It is a long-established principle in Wisconsin that the grant or refusal of a continuance is a matter within the discretion of the trial judge.
 
 Knox v. Arnold
 
 (1853), 1 Wis. 70, 74, 75;
 
 Cottrell v. Giltner
 
 (1856), 5 Wis. 270, 274. A decision on a motion for a continuance will be
 
 *321
 
 set aside only if there is evidence of an abuse of discretion.
 
 Estate of Hatten
 
 (1940), 233 Wis. 256, 263, 289 N. W. 630.
 

 In
 
 Page v. American Family Mut. Ins. Co.
 
 (1969), 42 Wis. 2d 671, 168 N. W. 2d 65, these guidelines were reaffirmed and applied to the current statutory provision on continuances, sec. 270.145, Stats.
 

 When the appellants secured the temporary order for guardianship, it appears that they submitted an order for a hearing on their petition for permanent guardianship. The trial court signed such order, which indicated that the petition would be heard on August 19, 1974 or “as soon thereafter as the matter can be heard” with notice to interested persons to be made by service of a copy of the order at least “48 hours prior to the hearing.” Apparently the desirability of an early disposition was paramount in all parties’ minds and the ten-day notice requirement of sec. 879.05 (3), Stats., was dispensed with. The necessary parties received notice and a hearing was held on August 20,1974.
 

 At the conclusion of that hearing, the trial court stated:
 

 “Gentlemen, the first witness, Rev. Hanchett, recommended a third party investigation. This matter is obviously extremely complicated. The Court is not going to make a final determination on the appointment of a guardian today. I will adjourn the matter . . . until Friday, August 30 ... In the meantime, I will request the [Department] to make a third party and hopefully impartial investigation of the two proposed homes.”
 

 In the letter to the Department, the court phrased its request in terms of a comparative study of the households with the objective that the report be completed in time for a final determination before the start of the school year.
 

 Jodi Monfils and Chris Prust, representatives of the Department, submitted their report on August 27, 1974.
 
 *322
 
 They recommended that Mr. and Mrs. Barkholtz be appointed as the guardians. At the continuation of the hearing on August 30, 1974, the appellants submitted a motion to continue the action “from day to day” until psychological testing and psychiatric evaluation of test results could be utilized in determining placement of the children, until all alternatives for placement of the children could be considered and until the trial of George Schmidt was concluded.
 

 The trial court was initially concerned about the lack of notice on the motion. Ruling was deferred, however, until the merits of the motion could be considered in light of proposed testimony referred to in an accompanying affidavit. This testimony was provided by Dr. Gerald A. Gehl, a specialist in child psychiatry.
 

 Dr. Gehl testified that although he had been contacted by the attorney for the appellants, he wished to proceed as an independent evaluator, possibly in conjunction with the guardian
 
 ad litem.
 
 Lacking time to establish such an arrangement, he had proceeded to interview the appellants and review both the current report from the Department as well as the prior custody study of the parents. Dr. Gehl’s initial testimony disclosed that he had interviewed the Brezinskis for one hour and could not agree with the few negative aspects attributed to them in the report.
 

 He had not interviewed the Barkholtz family. Dr. Gehl did conclude that there were positive factors in favor of the Brezinskis being named as guardians. He reiterated that some of these factors were not necessarily determinative, as they were advantages shared by the Barkholtzes. Of more importance was his recommendation that action be deferred until the children could be evaluated and until a more comprehensive study of the two households and other alternative placements be made.
 

 His reasons for this recommendation included the observation that no significant evaluation of “their past
 
 *323
 
 adjustments, home behavior, school adjustments as to behavior, academic, peer relationships” had been made, which he deemed essential to the best interests of the children. Dr. Gehl noted that if these criteria were stable and good, he might suggest strongly that the children remain in the present custody of the Brezinskis. Secondly, he noted that the current adversary situation implied lack of agreement as to the two proposed placements and thus other alternatives needed to be considered.
 

 The mention of further alternatives was no basis for a delay. Dr. Gehl indicated that there were other relatives of the Schmidts who could perhaps be considered. There is no indication that such relatives were either willing or suitable for guardianship of the three children, although it seems inconceivable that they were unaware of the unfortunate circumstances. It would also be pointless to consider placement in a foster home of strangers when the real problem confronting the court was to decide the comparative merits of two fine households closely related to the minors.
 

 Was it an abuse of discretion to determine guardianship without recourse to the testing and interview evaluation of the children, as suggested by Dr. Gehl? It is undisputed that such an examination may involve anywhere from three to six months’ time. Monfils, although noting that the time limitations had forced a normal amount of investigation “in an abnormally short period,” advised against further delay. Both she and Prust believed that there was no need for psychological evaluation of the children. She cited the possibility that the testing might create unnecessary trauma for a child, and that nothing in the Schmidt children’s behavior indicated that such testing was necessary. Prust also testified that she saw no emotional problems in the children during her visit with the Brezinskis, who had indicated that the children were not giving them any trouble.
 

 
 *324
 
 Dr. Gehl admitted that his proposed evaluation be undertaken even if the parties could agree on a placement. It is clear that the philosophy underlying his recommendation is that comprehensive testing and interview of minors be a requisite part of all placement situations, whether in divorce custody, guardianship or adoption. This view is in contrast with the social workers’ attitudes that psychological review be resorted to only if the child’s behavior indicates problems in adjustment. Although such in depth and time consuming evaluation is necessary in some cases and would perhaps be an aid in others, there comes a point when desirable expectations must confront reality. Studies of this nature, if required in all cases, would be costly burdens for the counties, state and estates of the minors involved. Insofar as the testimony implies that such analysis is necessary in all cases, the trial court’s denial of the motion was proper in refuting that contention.
 

 Although Dr. Gehl’s proposal, at least as indicated from his testimony, may be appropriate to determine whether the placement with a permanent guardian is benefiting the minors, there is no basis to claim that the trial court abused its discretion by not affording such study before naming the guardian for apparently normal children.
 

 Father’s preference.
 

 The appellants criticize the following rationale of the trial court:
 

 “There’s one other aspect here. We have been treating this — I as well as both counsel — as though it were a custody or an adoption hearing. It is not. It is a hearing on guardianship, and one of the items which the Court must consider is a statutory preference for a natural parent. And, presumably, if a parent is not himself able to take that guardianship — and Mr. Schmidt has conceded that he is not able to do that — then and even so his nomination must carry some weight.
 

 “Based both on the test of the best interests of the children and the recommendations and the nomination of
 
 *325
 
 the natural father of the children, the Court will appoint Mr. and Mrs. Harry Barkholtz as the guardians of the person and estate of these three children.”
 

 Contention is made that the natural father’s nomination carries “no weight whatsoever” once he is found or stipulates that he is not suitable as a guardian, and that “nowhere in the statute is there a presumption that a parent who is not ‘suitable,’ namely, unfit, shall have a statutory right to nominate a guardian which is to be given precedence over other factors.”
 

 We think that the first proposition is incorrect, and that the latter argument, although perhaps correct, is not demonstrated as occurring here.
 

 The father stipulated to his unsuitability as a guardian because of his incarceration. Counsel for the Brezinskis apparently attempted to establish that Mr. Schmidt was morally unfit by submitting proof of the pending criminal action, which was properly rejected by the court as immaterial. We note that counsel defended criticism of the Brezinskis for concealing the alleged cause of the mother’s death from the children on the grounds that no adjudication had been made. Even had such conviction occurred, it is not necessarily an automatic determination that the father was thereafter unsuitable as a guardian.
 

 In
 
 State ex rel. Tuttle v. Hanson
 
 (1957), 274 Wis. 423, 80 N. W. 2d 387, guardianship was analyzed. The word “suitable” was not considered synonymous with “fit.” The latter connotes moral rectitude, while “suitable” in the statutory pattern is broad enough to include all policy considerations which should be weighed by the court in determining child custody placements, including the best interests of the minor.
 
 Id.
 
 at 431.
 

 If a parent is found unfit to be a guardian, a more precise determination than the statutory requirement of “unsuitable,” there may be a basis for ruling error in considering his recommendation. The more correct at
 
 *326
 
 titude would be to weigh the nomination for what it is worth, especially in light of sec. 880.09, Stats., which requires that the court consider nominations made by any interested person. This statute, acknowledged by the trial court, does prefer that a natural parent be chosen as guardian if he is suitable and willing. It is a recognition of the natural love that most frequently exists between child and parent. A rule barring the consideration of the nomination of “unsuitable” parents would be unreasonable if applied against those parents suffering from physical disability or failed fortunes, whose intimacy with the minor uniquely qualifies them to make a most suitable recommendation despite their own unsuitability.
 

 A reading of the judgment shows that the process outlined above was followed by the trial judge. Immediately before the trial court discussed the nomination by the father, he stated:
 

 “The guardian ad litem has made a recommendation after having been present throughout the three half days of hearings. In addition, he has had the background of the divorce action itself prior to the present unhappy situation and while his recommendations are not binding on the Court, they are entitled to be considered by their weight. The same is true of the Department of Social Services. While they were requested to make an investigation by the Court, the Court is not bound by it, but again they have had considerable experience with the matter and their recommendation is entitled to some Weight.”
 

 Both recommendations were in favor of the Barkholtzes. It is clear that the court was merely reiterating the factors persuasive to its conclusion. This situation is somewhat like that of
 
 In re Guardianship of McChesney
 
 (1900), 106 Wis. 315, 82 N. W. 149, where a claim was made that undue weight was given to the minors’ expressed choice and to the nomination of a guardian by will, and where the statute made no such provision as
 
 *327
 
 to their relevance. As in that case, the father’s nomination here went to the weight of the evidence and was not considered controlling as a “rightful legal disposition” in any sense.
 
 Id.
 
 at 320, 321. The record is barren of the argued contention that the court created a “presumption” or a “statutory right” that gave precedence to the unsuitable father’s nomination over other factors.
 

 Abuse of discretion.
 

 The final challenge to the decision of the trial court is the contention that the court abused its discretion by awarding the guardianship contrary to the best interests of the children. Considering the great weight and clear preponderance of the evidence, the Brezinskis contend that the best interests of the minors direct their appointment.
 

 This court may review the record in its entirety in deciding whether the trial court has abused its discretion.
 
 Hyslop v. Maxwell
 
 (1974), 65 Wis. 2d 658, 664, 223 N. W. 2d 516, but will look for reasons to sustain the trial court rather than make an independent review of the question as is done for challenged legal error.
 
 Littmann v. Littmann
 
 (1973), 57 Wis. 2d 238, 250, 203 N. W. 2d 901.
 

 The trial court aptly noted that the hearing was directed to a choice of a guardian; it was not a divorce custody or adoption hearing. Sec. 880.09, Stats., provides that in selecting a guardian:
 

 “The court shall consider nominations made by any interested person and, in its discretion, shall appoint a proper guardian, having due regard for the following:
 
 « 99
 

 The revelant factors include a preference for a minor’s parent to be the guardian if “suitable and willing,” otherwise the court could consider a selection by the minor if the child is over fourteen years of age or could select a guardian nominated in the will of a deceased parent.
 

 
 *328
 
 Both parties appear to accept the standard of. “the best interest of the child” as controlling here. We think the conclusion is inescapable that the best interests test be followed. Nothing in the guardianship section indicates otherwise, although preference is given to certain nominations. This test, however, does not consist of concentration solely on the objective factors to the exclusion of the rights, legal or moral, of parents. See sec. 48.01 (3), Stats., cited in
 
 Adoption of Randolph
 
 (1975), 68 Wis. 2d 64, 77, 227 N. W. 2d 634. It must be considered in the balance, as the child’s best interest may direct that a relationship be allowed between the child and the natural parent or other close relative that is known to him.
 

 There is every indication that the trial court followed the best interest test in an other than “abstract” manner, giving due relative weight to the best interest of the children in continuing their relationship with their natural father and other blood line members. The pronouncement of the trial judge specifically referred to these factors.
 

 Appellants contend that such enunciation is insufficient. As a general proposition, the trial court must set forth the factors which influenced its discretion, so that a proper review may follow.
 
 Loomans v. Milwaukee Mutual Ins. Co.
 
 (1968), 38 Wis. 2d 656, 660-662, 158 N. W. 2d 318.
 
 Littmann, supra,
 
 at 247.
 

 The trial court did disclose the major factor that determined the decision. No specific findings of fact, supported by the great weight and clear preponderance of the evidence and normally necessary to determine “best interests,” were made. The facts were mainly undisputed, however, and directed the conclusion that the prospective guardians were equally qualified:
 

 “It is my judgment that both of the proposed sets of guardians would be able to handle the job, much better
 
 *329
 
 able, as I think Mrs. Monfils said, than in situations where we don’t have such alternatives.”
 

 A brief review of the testimony supportive of this conclusion would show its correctness, before reference is made to the crucial distinctive factor.
 

 Homing.
 

 Both families live in good sections of their respective towns. Each has a large house with extra rooms. The report of the social workers reflected the adequacy of the dwellings. The children had acquaintances in both areas, although they knew more children in the grandparents’ neighborhood.
 

 Financial.
 

 Mr. Barkholtz earns approximately $25,000 annually while Mrs. Barkholtz is also employed and earns $8,000. She stated she would quit her job if necessary, but had made arrangements for a next door neighbor to babysit if she continued working. The Barkholtzes support one son who is finishing high school, and another son who has graduated but was working until his college plans are settled. Mr. Brezinski is the sole wage earner, with a yearly income of $15,000.
 

 Relations with, the children.
 

 The Brezinskis had longer and more sustained contact with the children, who had frequently stayed overnight with them both before and after the commencement of the divorce action. The Barkholtzes have seen the children mainly since the divorce action began, when George Schmidt would bring them to their house during his visitation periods. He had been residing with the Barkholtzes.
 

 Separation tra/wma.
 

 The children were familiar with the house and persons in each family, although they had more sustained rela
 
 *330
 
 tions with the Brezinskis. Since the death of their mother, they had been with the grandparents for a little over two weeks.
 

 Age.
 

 At the time of the hearing, Mr. and Mrs. Brezinski were fifty-six and fifty-four years of age. Mr. and Mrs. Barkholtz were forty-seven and forty-five years of age.
 

 From these considerations, it is apparent that either party would have been adequate. Had this been an adoption hearing, perhaps more weight would be accorded the age and finance factors. At the same time, the established close ties with the grandparents would have perhaps more than offset these considerations. A close question would have been presented as to whether the court abused its discretion in selecting the Barkholtzes.
 

 This was not, however, an adoption hearing. The key factor was indicated in the following discussion by the trial court:
 

 “Mr. Snyder alluded to the fact there are other cases involving somewhat similar problems now before the Court, and I have watched family situations where because of deeply held feelings of one party or another, one parent was excluded from the family group.
 

 “I believe very deeply Mr. Brezinski when he said in his first testimony that he would give every ounce of his life for those children. I think he’s entirely sincere in that. I also believe that he would have great difficulty, because of this love for those children, in accepting the fact that their father remains their father regardless of the situation. Dr. Gehl indicated that there was considerable anguish on the part of the grandparents regarding visitation, although I commend you for the effort you have made in allowing visitation on the part of Mr. Schmidt’s family. I know that is difficult for you and you have done what you feel you should.”
 

 The relationship between the Brezinskis and George Schmidt had been strained by the divorce action. It
 
 *331
 
 would be an understatement to say that those relations certainly did not improve upon the tragic death of their daughter.
 

 In apparently a scene of emotional strain, George Schmidt testified as to why he had recommended that the Barkholtzes be named guardians. He reiterated what he deemed the “interference” of the Brezinskis in his marriage. The reports of Dr. Gehl and the social workers indicate that the Brezinskis demonstrated the abundance of concern that many grandparents show to their grandchildren. From the incidents as related by Mr. Schmidt, however, it appears that his deceased wife welcomed and encouraged this concern for herself and the children to the exclusion of the father’s contact with them, and that he feared the loss of his own parental status with the children. Dr. Gehl in fact noted that the grandparents “may already have been parent substitutes,” and that this may have contributed to the Schmidt marital difficulties.
 

 The appellants attempt to avoid this factor by stressing the claimed willingness of the Brezinskis to allow visitation by the Schmidt family. While this must be considered, Dr. Gehl noted that they probably had not “sorted their feelings out,” that Mr. Brezinski admitted that he would not assist the children and George Schmidt in being together (but would not resist any arrangements to that effect) but that they were struggling not to “prejudice the children in any way against their father.” The social workers believed that the Brezinskis would not be able to allow George Schmidt to visit the children and that they were concealing their feelings concerning him. Significantly, there is little to support the belief that the Brezinskis could accept the children having visitation with the father rather than merely with his relatives. It is hard to believe that their estranged attitude toward him would not be communicated to his children in their
 
 *332
 
 custody, and affect the minors’ attitude toward him. The death of the mother of these children, under the circumstances here, will undoubtedly cause a strain on the familial relationship between the children and their father and further aggravation of it should be avoided. It must be recognized that the trial court had the opportunity to observe the conduct and demeanor of the witnesses in evaluating their statements.
 

 Although custody in this situation may be lengthy, there is always the likelihood that the father will be in a position to be “suitable” to resume custodianship of his children in their minority. Until his rights as a parent are terminated, guardianship should not be placed in the hands of those most likely to impair the moral right of both he and his children to visit and share their familial love. This factor was duly noted and considered by the trial court, along with other testimony and recommendations. We think the trial court properly applied the test of “the best interests of the childan abstract rule was not applied, but consideration was given to both the objective factors and blood ties. An appointment was made that would preserve the familial bonds of all concerned. The natural father’s interests were not jeopardized, while the court possesses the power to order visitation for the Brezinskis if the parties cannot agree on that matter themselves.
 
 See:
 
 sec. 880.155, Stats., created by ch. 122, Laws of 1975. Since the children were familiar with the Barkholtzes and loved them also, it is best that they be placed in a guardianship where their separate identities will not be lost.
 

 By the Court.
 
 — Order affirmed.