ADOPTION OF RANDOLPH: YOUNG and wife, Appellants, v. ALDERSON, Guardian *ad litem,* and others, General Guardians, Respondents.*

*No. 451. Argued March 6, 1975.—Decided April 10, 1975.*
(Also reported in 227 N. W. 2d 634.)

* Motion for rehearing denied, with costs, on June 30, 1975.

For the appellants there was a brief by *Walther & Halling*, attorneys, and *David L. Walther, Georgia A. Felger* and *James A. Barrock* of counsel, all of Milwaukee, and oral argument by *David L. Walther*.

For the respondents there was a brief by *Levy & Levy, S. C.* of Cedarburg, and a brief by the guardian *ad litem William F. Alderson*, attorney, and *Schloemer, Schlaefer & Alderson, S. C.* of counsel, all of West Bend, with oral argument by *William F. Alderson*.

WILKIE, C. J. On this appeal the petitioners-appellants, Donald and Ethel Young, the maternal grandparents of Michelle and Michael (the two children sought to be adopted), seek a review of the trial court's determination denying their proposed adoption on the ground that it would not be in the best interests of the children. The mother of the children, Donna Randolph (née Young), was killed in an automobile accident on November 6, 1971. She and her husband, Donald Randolph (who also was killed in the accident), were driving from Chicago, where they had recently moved, to visit the Youngs. Their two small children, Michelle, born January 5, 1970, and Michael, born December 21, 1970, were also injured in the accident, Michelle very severely. After the accident Michael was hospitalized for a short while and then spent time in a foster home until Judge BYRON B. CONWAY of Wood county awarded guardianship of Michael and also of his sister Michelle (who had spent the entire intervening time since the accident in a hospital) to the respondents Diane and Lee Carron. Diane Carron was the first cousin of Donna. The guardianship was approved on January 6, 1972, and the children remained with the Carrons from that date. In September of 1972, the Youngs petitioned the county court of Washington county for the adoption of their grandchildren. The Carrons, as guardians, did not initiate their own petition for adoption. The court considered the matter extensively, hearing testimony from various parties, including the Youngs, the Carrons, a psychiatrist and a social worker for the Department of Health and Social

Services. The court received adverse recommendations from a social worker for the Department of Health & Social Services and the guardian *ad litem,* William Alderson. The Youngs, who have been married for thirty years, live on a farm near Phillips. They own 323 acres of land. Although the couple does some farming, Mr. Young is employed full time at Evans Products Company, located in Phillips. Mr. Young was fifty-nine years of age at the time of the adoption hearing and Mrs. Young was fifty. They are presently raising another child of Donna, Donald, Jr., whom they have adopted. Two other children of Donna, by a previous marriage, are staying with their father.

Appellants contend that the trial court's denial of adoption contravenes the legal rights of the grandparents who stand in the legal shoes of the deceased parents and have the right to the award of the adoption in the absence of a finding that they are unfit. Appellants also contend that the trial court erred in determining that adoption by the Youngs was not in the children's best interests. We conclude that both of these contentions are without merit and that the order of the trial court must be affirmed.

The Youngs contend that they are legally entitled to adopt Michelle and Michael unless found unfit as parents. Their reliance on *Ponsford v. Crute* [1] in this action is misplaced. True, in *Ponsford* the court did say:

" '. . . before a trial court can deprive the natural parents of custody, there must be findings supported by the evidence sufficient to show that both natural parents are either unfit or unable to adequately care for the children.' " [2]

[1] (1972), 56 Wis. 2d 407, 202 N. W. 2d 5.

[2] *Id.* at page 413, quoting *Sommers v. Sommers* (1966), 33 Wis. 2d 22, 26, 146 N. W. 2d 428.

However, in the very recent case of *LaChapell v. Mawhinney*,[3] this court said that the best interests of the child are of paramount importance rather than any right of the natural parents:

". . . The conclusion reached by this court in *Ponsford* should not be interpreted as laying down an inflexible rule . . . . As a general matter, but not invariably, the child's best interest will be served by living in a parent's home. However, if circumstances compel a contrary conclusion, the interests of the child, not a supposed right of even a fit parent to have custody, should control. There well may be cases where it would be detrimental to the best interests of the child to award custody to a surviving spouse."

Thus, although *Ponsford* and *Mawhinney* arose in the context of a sec. 247.05 (4), Stats., independent custody action rather than an adoption action, *Mawhinney* does represent a rejection of the idea of "rights" to the custody of a child.

There is no authority holding that in an adoption proceeding the grandparents accede to whatever rights the natural parents may have had. Sec. 48.84, Stats., provides in part:

"**Persons required to consent to adoption.** (1) No adoption of a minor may be ordered without the written consent of the following to the adoption of the minor by the petitioner:

"(a) The parent or parents, if living, provided that consent shall not be required from one whose parental rights have been legally terminated . . . ."

No similar right is accorded grandparents, or any other relative. A contention similar to that made here by the Youngs was considered and rejected in *Adoption of Jackson*.[4]

---

[3] (1975), 66 Wis. 2d 679, 683, 684, 225 N. W. 2d 501.

[4] (1930), 201 Wis. 642, 645, 231 N. W. 158, overruled on other grounds by *Adoption of Tachick* (1973), 60 Wis. 2d 540, 548, 210

Thus, the whole controversy boils down to a consideration of whether the denial of the adoption here by the trial court was in the best interests of the children.

In adoption cases the paramount consideration is the best interests of the child.[5] In *Adoption of Tachick* [6] we stated that the determination of the best interests of the child by the trial court is a question of law. This is only partially true. The finding is a mixed question of fact and law. There are certain determinations of historical facts [7] which must be sustained unless they are clearly against the great weight and clear preponderance of the evidence. The determination of where the best interests of the children lie is thus a question of fact in the sense that precise determinations must be made about specific factors such as age, finances of the parties, discipline questions, and psychological factors. The application of the correct standards for determining the best interests of the child and the ultimate conclusion of where the best interests of the children lie is a matter for legal determination by the trial court, reviewable as such on appeal. There is no question that the trial court relied principally on the danger of separation trauma if the children were to be removed from the Carrons' home and placed in adoption with the Youngs. Michelle and Michael have become completely integrated into the Carron family. They call the Carrons "mother" and "father" and refer to the other children as brother and sister. Throughout the hearings the Carrons were described as very good parents who provide a warm, loving home.

N. W. 2d 865 (*Jackson* held the best interests of the child to be a factual issue, while *Tachick* held it to be a question of law, withdrawing contrary language in *Jackson*).

[5] *Adoption of Shields* (1958), 4 Wis. 2d 219, 89 N. W. 2d 827; *Adoption of Tachick, supra,* footnote 4.

[6] *Supra,* footnote 4, at page 548.

[7] *Cf.,* concurring opinion on rehearing in *State v. Hoyt* (1964), 21 Wis. 2d 284, 305, 128 N. W. 2d 645.

Dr. James Balistrieri, a child psychiatrist, testified he was "very impressed" with the Carrons' abilities as parents.

At the time of the hearing, Michelle and Michael had been in the Carron home for twenty months. The danger of separation trauma was specifically discussed by two social workers, Alice Hartfel and Barbara Peterson, and by Dr. Balistrieri. Alice Hartfel said that in her experience, moving a young child from a home where he or she is well-adjusted has adverse effects:

". . . We find that at first they usually are very withdrawn and have difficulty adjusting to work very closely with their families. Since the children do show effects of the movement, they cry a lot. They are insecure. They are afraid, sometimes afraid to do things because they don't know what the reaction is going to be. . . . [W]e find that it takes several months for these children to begin to acclimate to school and to the change in their environment."

She further stated that one cause of separation trauma is the youngster's inability to understand the reasons for the move. The child may feel rejected and unloved:

"I think we have in our experience found moving from one home to another has had adverse effects upon the children. It affects their security and it affects their feelings about the people that they have had to move away from and makes them feel unwanted because you cannot explain to a child of this age why they are moving, or it is difficult for them to understand that someone wants them or does not want them. They only know what is happening to them."

Barbara Peterson stated that the danger of separation trauma is particularly severe because of the trauma Michael and Michelle had previously been subjected to:

". . . In the case of Michael and Michelle they suffered the loss of their natural parents. They have been involved in a traumatic kind of accident. Michelle had

hospitalization. And Michael was in foster care, was in a foster home, while Michelle was in the hospital, plus the fact that, even when they were with their natural parents, there were periods of time when the family was not together as a unit. By that I mean, sometimes Mr. Randolph was there and sometimes he wasn't. And much of the time they were in the home of their grandparents. So because of this the children have already had very complicated lives and have had chaotic lives and to expose them to a move at this time would be one more event in their young lives which could very well be detrimental to their physical and social development."

It must be noted that Michelle had a difficult time adjusting to the Carrons' home. At first she was introverted and withdrawn and had problems eating. However, through the months, she lost these qualities completely and was ultimately described as a "normal happy child" who "seemed to have gained quite a bit of confidence in herself."

Dr. Balistrieri agreed that Michael and Michelle could suffer serious separation trauma "irrespective . . . that where they are going is a loving home." He particularly commented upon the fact that they have become completely integrated into the Carron family:

". . . They have accepted these people as their parents. For all they know, the other parents did not exist. The youngest child was too young in terms of memory to remember; the oldest child went through an automobile accident that I am certain erased quite a bit of memory of these two people. They have lived there for some twenty months. So to accept some other people as their parents is going to be extremely difficult. To accept their children as brothers and sisters is going to be extremely difficult. They have one advantage, the fact that there are two of them, instead of only one of them. So they have each other to serve as a buttress. So it is going to be difficult.

"If you are asking the question whether it can be done, sure it can be done, but there is going to be an effect.

What one might reasonably anticipate is regression in behavior: potty training, night bedwetting, thumb sucking, trauma, and tantrums, more aggressiveness."

Dr. Balistrieri went on to state that each additional displacement "is more difficult for the child to handle." He further indicated that while "most" of this regressive behavior would be temporary in nature, its continued persistency would depend upon how satisfactory or healthy the new home would be. Based upon his view that the Carrons were presently providing a very good home for the children, Dr. Balistrieri recommended against granting the adoption petition and thereby exposing Michael and Michelle to the risks of separation trauma. However, he would reach a different conclusion if the Carron home were unsuitable or the children were not happy there.

Other factors which were considered by the court do not point substantially to either the Youngs or the Carrons as adoptive parents.

### Finances.

The Youngs own a substantial farm and in recent years Mr. Young has been employed with an annual income of $11,000. Undoubtedly they could provide for the two children. On the other hand, Mr. Carron had an income as a liquor saleman of approximately $11,000 a year for the five or six years preceding 1971. He then operated a tavern and hotel in Jackson, Wisconsin, with an income of approximately $47,000 after taxes. In 1972 he sold the hotel and bought a country club, which he operated at a loss. In 1973 he moved to Sheboygan where he started his present business of selling snack items to food retailers. The business had been operating profitably in the three months preceding the hearing. He estimated his

current yearly income to be approximately $25,000. The Carrons receive $92 per month from social security for each of the children. These payments would cease upon adoption by the Carrons. The Carrons testified that they plan to adopt the children after Michelle is medically released even though it would mean the loss of the monthly social security allowance. Michelle, who received a broken neck, severe head injuries, and a broken leg, among other injuries in the 1971 automobile accident, has had thousands of dollars in medical expenses, all apparently paid by governmental welfare programs. There is a possibility that a further operation costing $4,000 or $5,000 will be required for Michelle's neck. Mrs. Carron said they had checked with three different insurance companies, all of which refused to cover any expenses from neck surgery arising from the pre-existing accidental injuries. Michelle was expected to be medically released in November, 1973, several months after the hearing, but the record is, of course, silent as to any later developments. Mr. Carron said they had been advised by Michelle's doctor to delay filing an adoption petition until her medical release. The Carrons said that despite the risk of incurring huge medical bills from neck surgery, they would file an adoption petition if the court felt it necessary to fortify their position in the litigation.

The Youngs indicated that they had been advised that their health insurance policy would cover most of Michelle's expenses.

## Age.

The trial court did point out the age problem by stating that when the children reach the age of adolescence "Mr. Young would be approximately seventy years of age and Mrs. Young in her sixties. There is doubt that at that

age these parties would have the vitality to cope with the problems that arise."

### Discipline.

During the hearing, Mr. Young admitted an insufficiency on his part with respect to discipline and the trial court did note this deficiency but did not place heavy reliance on it: "I would not agree with the emphasis placed upon Mr. Young's alleged ability to discipline in that recommendation; but, nevertheless, it still must be recognized."

In questions involving the determination of what is in the best interests of the children, whether in an adoption case or a divorce case, it must be recognized that the trial court has the chance to observe the conduct and demeanor of the witnesses, and its determination of the question of what is in the best interests of the children may not easily be overturned by this court. Thus, in *Larson v. Larson*,[8] a divorce case, we said:

"This court is firmly committed to the principle that the findings of fact and orders of the trial court concerning the custody of minor children in divorce actions will not be set aside or reversed unless clearly against the great weight and clear preponderance of the evidence, or unless there is a clear abuse of discretion.

" 'Custody matters are highly discretionary and the rule is well established that the trial court's determination will not be upset in the absence of a clear abuse of discretion.' *Belisle v. Belisle* (1965), 27 Wis. (2d) 317, 321, 322, 134 N. W. (2d) 491.

" 'As has been repeatedly held by this court, the matter of the custody of children in divorce actions is a matter peculiarly within the jurisdiction of the trial court, who has seen the parties, had an opportunity to observe

---

[8] (1966), 30 Wis. 2d 291, 296, 140 N. W. 2d 230, quoted with approval in *Heiting v. Heiting* (1974), 64 Wis. 2d 110, 119, 120, 218 N. W. 2d 334.

their conduct, and is in much better position to determine where the best interests of the child lie than is an appellate court.' *Adams v. Adams* (1922), 178 Wis. 522, 525, 190 N. W. 359; *Hamachek v. Hamachek* (1955), 270 Wis. 194, 202, 70 N. W. (2d) 595."

Under sec. 48.85, Stats., where, as here, the guardian and guardian *ad litem* recommend against the adoption, the petitioners have the burden to prove by a fair preponderance of the credible evidence that the adoption would be in the best interests of the child. That section provides, in part:

"**Recommendation of guardian.** (1) At least 10 days prior to the hearing, the guardian shall file its recommendation with the court.

"(2) The guardian's recommendation shall be presumed to be in the best interests of the child unless the fair preponderance of the credible evidence is to the contrary. If the guardian's recommendation is in opposition to the granting of the petition, the court shall take testimony as to whether or not the proposed adoption is in the best interests of the child."

We conclude that the Youngs have not sustained this burden and that the trial court did not abuse its discretion in denying their adoption petition.

The Carrons, on the other hand, presented the testimony of three expert witnesses, all of whom said that substantial separation trauma could result from moving the children. The Youngs did not introduce any expert testimony to rebut the conclusion of the Carrons' witnesses. The conclusion of the Carrons' witnesses does not appear to be patently unreasonable and the trial court could properly rely upon their opinions.

The trial court carefully considered all of the relevant factors and we conclude that it did not err in determining that granting the adoption petition by the Youngs was not in the best interests of Michelle and Michael.

*By the Court.*—Order affirmed.

DAY, J. *(dissenting)*. I respectfully dissent from the majority opinion. In my opinion the trial court either legally abused its discretion or did not properly exercise its discretion in denying the petition for adoption of these two small children by the maternal grandparents, Mr. and Mrs. Donald Young.

Sec. 247.24 (1), Stats., although it is a statute dealing with annulment and divorce, by analogy provides [1] that where the parents are unable to care for minor children, as they obviously are here, because they are deceased, the children should then go to a relative or to an agency, in that order, with the relative having obvious preference over an agency.

"Relative" is defined in sec. 48.02 (12), Stats., as:

" 'Relative' means a parent, *grandparent,* brother, sister, uncle or aunt. This relationship may be by consanguinity or direct affinity." (Emphasis added.)

The Carrons in this case do not fit into any of those categories. Mrs. Carron is a first cousin of the children's deceased mother and has no more standing under the statute than a complete stranger.

---

[1] "247.24 **Judgment; care and custody, etc., of minor children.** (1) In rendering a judgment of annulment, divorce or legal separation, the court may make such further provisions therein as it deems just and reasonable concerning the care, custody, maintenance and education of the minor children of the parties, and give the care and custody of the children of such marriage to one of the parties to the action, or, if the interest of any such child demands it, and if the court finds either that the parents are unable to adequately care for any such child or are not fit and proper persons to have the care and custody thereof, may declare such child a dependent *and give the care and custody of such child to a relative (as defined in ch. 48) of the child,* a county agency specified in s. 48.56 (1), a licensed child welfare agency, or the department of health and social services. The charges for such care shall be pursuant to the procedure under s. 48.27." (Emphasis supplied.)

It is obviously the legislative intent that whatever "rights" a parent may have when those rights are terminated for whatever reason, care and custody of minor children then go to the grandparents. Even if the statute were to be interpreted as meaning that all of these relatives stood on an equal footing, it would certainly mean that the Carrons have no standing at all under this statute.

Parents do have "rights" with respect to their children and it has been given to them by the legislature. Sec. 48.01 (3), Stats., of the Children's Code, provides:

"This chapter shall be liberally construed to effect the objectives in sub. (2). The best interests of the child shall always be of paramount consideration, but the court shall also consider the *interest of the parents* or guardian of the child and the interest of the public." (Emphasis supplied.)

I disagree that *LaChapell v. Mawhinney* (1975), 66 Wis. 2d 679, 225 N. W. 2d 501, overrules the basic holding in *Ponsford v. Crute* (1972), 56 Wis. 2d 407, 202 N. W. 2d 5, wherein this court in *Ponsford* said:

" '. . . before a trial court can deprive the natural parents of custody, there must be findings supported by the evidence sufficient to show that both natural parents are either unfit or unable to adequately care for the children.' "

The facts in *LaChapell* are entirely different than they were in *Ponsford* or than they are in the case at bar. The majority opinion in *LaChapell* said, page 684:

"Here the trial court made findings that prior to the death of Alice Mawhinney, the father had abandoned the children, that he had failed to provide necessities for them, that he had failed to display any interest whatsoever in the children and had illicitly lived with a woman he has since married. Here the children have expressed a desire to remain with the grandparents."

In a concurring opinion two of the justices stated they were prepared to state ". . . that the plaintiff husband was unfit as a matter of law." The case was sent back so that the trial court could appoint a guardian *ad litem* to represent and speak for the best interests of the children at a new hearing to be held.

The record in this case indicates that the grandparents far from being "too old" were in good health, already taking care of a nine-year-old boy, the half brother of these children, whom they had adopted. The record shows these grandparents are well able to take care of these children. Grandparents have been taking care of children in our society since time immemorial. If only an abstract "best interest of the child" concept is followed, it would mean that any time that younger, wealthier, more socially interesting people wanted to adopt someone's children, it could easily be argued that it would be in such children's "best interest" to be adopted by such people if they were obviously superior to the natural parents, who might be poorer, less educated and less able to provide the luxuries of life. Such a concept naturally follows when the "rights" of blood members of the family are ignored and when the natural ties of affection that come from being closely related are cast aside. But blood and kinship ties cannot be ignored. It is in recognition of what has been the universal experience of mankind over the generations that has prompted the legislature both to recognize the natural rights of the parents and to grant custody to close relatives when the parents, for whatever reason, cannot properly function as such. In this case the love and affection of these grandparents are abundantly clear from the record and from the great length they have gone to on moderate means to adopt these children. The Carrons did not try to adopt these children and while they say they would be willing to, the fact is that only the grandparents have made the move.

The Carrons would lose the $190 per month in social security benefits paid for the support of these children if they adopted them. It has been a lop-sided comparison between the twenty-six-year-old guardian and the fifty-year-old grandmother that resulted in the Carrons being allowed to have custody in the first instance. At that time the judge in awarding the temporary custody of these children to the Carrons on the 6th day of January, 1972, said: "I think both of the petitioners are highly desirable people. . . . Balancing everything, I feel that a younger couple is better capable of over the years giving these children everything they should have."

At the hearing in September, 1973, the guardian *ad litem* stated:

"There is no question in my mind that both the Youngs and the Carrons are suitable, fit and capable to take care of these little children. . . . Are the prospective parents fit and responsible persons in whose home the child is to be placed? I think they are, the Youngs."

However, the guardian *ad litem* recommended against the adoption because of the alleged "separation trauma" because the children had been with the Carrons for several months and there was testimony that this would be "upsetting" to these small children to be separated from the Carrons and placed with their grandparents. Anyone familiar with small children knows that this type of separation trauma is of short duration and had children of this age been with others than their parents because of the parents temporary inability to care for them because of prolonged illness or having to be out of the country, it would be a rare case where a court would say, "You have been away for 20 months; you can't have your children!" This is a very slim reed to lean on in depriving custody to the ones whom the statute designates as next

in line for custody after the natural parents. The trial judge in denying the petition for adoption nowhere finds that the Youngs are not fit and proper people to have the custody of their grandchildren.

I would reverse.

I am authorized to state that Mr. Justice BEILFUSS and Mr. Justice HANLEY join in this dissent.