In the MATTER OF the ADOPTION OF R.P.R.
Ronald and Margaret BRANDT, Appellants,

v.

Patricia RIORDAN, Respondent.†

Court of Appeals

No. 79–1875.  *Argued January 23, 1980.—Decided March 12, 1980.*
(Also reported in 291 N.W.2d 591.)

† Petition to review granted.

574

For the appellants, the cause was submitted on the briefs of *Stephen W. Hayes* and *von Briesen & Redmond, S.C.,* and *Dale P. Gerdes* and *Gutknecht & Gerdes,* co-counsel of Milwaukee, and oral argument by *Stephen W. Hayes.*

The guardian ad litem was *Stanley F. Hack,* of Milwaukee, who submitted briefs and presented oral argument.

For the respondent, the cause was submitted on the brief of *David L. Walther, John Sundquist* and *Walther & Halling* of Milwaukee, and oral argument by *David L. Walther.*

Before Decker, C.J., Moser, P.J., and Brown, J.

BROWN, J. This is an appeal from an order of the trial court awarding custody of R.P.R., an infant, to the respondent Patricia Riordan, the biological mother. Ronald and Margaret Brandt, the adoptive parents of R.P.R., seek to reverse the trial court's order due to abuse of discretion. The trial court based its decision, in part, upon a presumption in favor of the natural parent and, in part, upon a finding that there was sufficient evidence adduced by Ms. Riordan to show that the best interests of the child would be furthered by giving the child back to her. Because we find that the trial court erred in interpreting the law as giving a presumption to the natural mother and also erred in finding sufficient evidence that the natural mother had met her burden, we reverse.

Ms. Riordan, while pregnant and unmarried, consulted Catholic Social Services concerning possible adoption of the child. The child was born on January 21, 1979. It was immediately placed in a foster home by Catholic Social Services. The foster-home placement was for a period of six weeks and was to precede the beginning of the adoption procedure.

On February 19, 1979, Patricia Riordan telephoned Margaret Brandt and asked her if the Brandts would be interested in an independent adoption of R.P.R. Riordan and Margaret Brandt had been coemployees. The record indicates that Mrs. Brandt knew of Ms. Riordan's pregnancy and that Ms. Riordan knew of the Brandts' desire to adopt a child. There is testimony in the record that Ms. Riordan was interested in placing the child with the Brandts because she was impressed with the Brandts' intellectual, moral and personal life and felt that the child would be brought up in a good home environment. The testimony also indicates that prior to the birth of

the child, Mrs. Brandt and Ms. Riordan had extended conversations concerning the pregnancy and the possible effect of the pregnancy on Ms. Riordan's employment, family and personal well-being. Mrs. Brandt had also visited Ms. Riordan in the hospital at the time of R.P.R.'s birth.

The Brandts consulted with Ms. Riordan, and the decision was made to proceed with the independent adoption of R.P.R. by the Brandts. On March 7, 1979, Patricia Riordan, in cooperation with the Catholic Social Services, transferred physical custody of R.P.R. to the Brandts. On March 14, 1979 pursuant to secs. 48.84(1)(a) and (2)(a), Stats., a hearing was held to execute the written consent of the parents to termination of the parental rights. The written consent was signed by Ms. Riordan and the natural father. The trial court explained the nature of the consent: "You understand that this consent when given is irrevocable, when the child is adopted you can't change your mind?" (Riordan testified at the later revocation hearing that she understood the trial court to mean that her consent was irrevocable only after the entry of the adoption order which would take place six months following preadoption residence according to sec. 48.90, Stats.)

On June 12, 1979, on the advice of her fiance Lawrence Witzling, Ms. Riordan commenced treatment sessions with a psychiatrist. At this time, Ms. Riordan exhibited strong feelings of ambivalence concerning the adoption of R.P.R. On August 1, 1979, she moved to revoke her consent to the adoption and to gain custody of R.P.R. The hearing and the trial court's granting of the motion for revocation of consent to adoption and awarding custody of R.P.R. to Ms. Riordan followed.

## I. BEST INTERESTS OF THE CHILD

The Brandts, at the revocation hearing and during oral arguments on appeal, have attempted to establish

the moral unfitness of Ms. Riordan to act as R.P.R.'s parent. They have argued that Ms. Riordan's consent to adoption represents a rejection of R.P.R., and she should not now be allowed to retract that rejection.

The psychiatric and psychological testimony offered at the revocation hearing, on the other hand, establishes that the Brandts and Ms. Riordan and her fiance, Larry Witzling, would be suitable and competent parents. The trial court made that finding as a matter of fact. This court does not question that finding. So far as this case is concerned, both Ms. Riordan and the Brandts are presumed in law to be fit as parents. We are not willing to engage in a pure weighing process of the physical, social and cultural benefits of R.P.R. residing with one set of parents as opposed to the other. We feel that Ms. Riordan's act of consenting to the adoption of R.P.R. was motivated by her love and affection for the child and her belief, at that time, that the consent was in the best interests of the child. We therefore specifically do not adopt the Brandts' argument that their home would be better than the home of the natural mother.

The issue here is not fitness to act as parents. Wisconsin, like the majority of jurisdictions, has long recognized that in adoption proceedings the paramount consideration is the best interests of the child.[1] While the

---

[1] See, e.g., In re Adoption of Morrison, 260 Wis. 50, 59, 49 N.W.2d 759, 763 (1951), reh. denied, 260 Wis. 69a, 51 N.W.2d 713 (1952). See also Adoption of Jackson, 201 Wis. 642, 645, 231 N.W. 158, 159 (1930), where the Wisconsin Supreme Court stated: "Whatever the situation may have been at common law, under the statute, sec. 322.02, there can be no doubt that the controlling consideration is and should be the welfare and best interests of the child."

For later recognition of this primary interest in Wisconsin see Adoption of Randolph, 68 Wis.2d 64, 68, 227 N.W.2d 634, 636–37 (1975); LaChapell v. Mawhinney, 66 Wis.2d 679, 683–84, 225 N.W.2d 501, 503 (1975). For general recognition of this

interests of a parent or parents are not irrelevant, where the parent's interest and the child's interest conflict, the child's interest must control.[2] The issue, then, is not which parent is more fit but rather how "the best interests of the child will be furthered." In this context, we examine the record to see if Ms. Riordan brought forth sufficient competent evidence to satisfy her burden of proof under sec. 48.86, Stats., "that the best interests of the child would be furthered" by allowing her to revoke her consent to adopt.

## II. THE TRIAL COURT'S DECISION

Section 48.84(2) (a), Stats., provides in pertinent part that, once given, consent to adopt is "irrevocable, except as provided in s. 48.86 . . . ." Section 48.86 provides:

48.86 Withdrawal of Consent. Withdrawal of any consent filed in connection with a petition for adoption hereunder shall not be permitted, except that the court, after notice and opportunity to be heard is given to the petitioner in the adoption proceedings, to the person seeking to withdraw consent and to any agency participating in the adoption proceedings, may, if it finds that the best interests of the child will be furthered thereby, issue a written order permitting the withdrawal of such consent. The entry of any order of adoption renders any consent irrevocable.

In finding sufficient evidence to allow Ms. Riordan to withdraw her consent to adopt, the trial court first explained that a presumption exists on behalf of the biological or natural parent in adoption proceedings. This presumption, coupled with the testimony at trial, includ-

---

primary interest in other jurisdictions, see Annot., 74 A.L.R.3d 421 (1976). See also 2 Am. Jur. 2d Adoption §46 (1962).

[2] In re Z., 81 Wis.2d 194, 203, 260 N.W.2d 246, 251 (1977). See also In re Termination of Parental Rights to Kegel, 85 Wis.2d 574, 583–84, 271 N.W.2d 114, 118 (1978).

ing expert psychological testimony, served as the basis for the trial court's decision. The trial court's finding of a presumption favoring natural parents will be examined first.

## A.   The Natural Parent's Presumption

The trial court relied on Wisconsin case law for precedential support in finding a presumption in favor of the natural parents. The court placed primary reliance upon *State ex rel. Lewis v. Lutheran Social Services,* 59 Wis.2d 1, 207 N.W.2d 826 (1973). In *State ex rel. Lewis,* the supreme court dealt with the question of whether the custody rights of the putative father of an illegitimate child could be terminated without notice and opportunity to be heard.[3] The court held that the notice requirement for termination of parental rights of the putative father of an illegitimate child should be the same as the notice requirement for termination of any other parental rights.

The majority opinion made reference to the dissent in that case stating:

The dissent expressly refuses to recognize that the bond of nature between a parent and a child born out of wed-

---

[3] *State ex rel. Lewis v. Lutheran Social Services,* 59 Wis.2d 1, 207 N.W.2d 826 (1973), originally came before the Wisconsin Supreme Court in *State ex rel. Lewis v. Lutheran Social Services,* 47 Wis.2d 420, 178 N.W.2d 56 (1970). In that case, a divided court determined that the natural father of a child born out of wedlock did not have any parental rights. The decision was appealed to the United States Supreme Court, and, while on appeal, the Court in *Stanley v. Illinois,* 405 U.S. 645 (1972), held that the father of an illegitimate child did have parental rights. In *Rothstein v. Lutheran Social Services,* 405 U.S. 1051 (1972), the earlier Wisconsin decision was remanded for further consideration in light of *Stanley* "with due consideration for the competition of adoption proceedings and the fact that the child has apparently lived with the adoptive family for the intervening period of time."

lock should not be less protected by law "simply because her natural father has not married her mother." . . . It likewise ignores consideration of the presumption that as between a natural parent and a third party, the "best interests of the child" lie with the natural parents' exercise of custodial rights. *State ex rel. Lewis v. Lutheran Social Services, supra,* at 12–13, 207 N.W.2d at 832.

The trial court relied in part upon that quotation to support its "natural parent's presumption."

While on its face, the language from *State ex rel. Lewis* lends itself to such an interpretation, this court is convinced that no such presumption is operative under Wisconsin law. The *State ex rel. Lewis* court was not directly deciding a biological versus adoptive parental rights conflict, but only whether the petitioner's rights as a biological parent should be terminated without affording him due process of law. *State ex rel. Lewis v. Lutheran Social Services, supra,* at 10, 207 N.W.2d at 831. Therefore, the reference to the presumption in the *State ex rel. Lewis* majority while commenting upon the dissent is without controlling effect in this case.

Moreover, because the *State ex rel. Lewis* court was deciding the right of the putative father as of the date of the initial judgment, the court expressly refused to consider the effect on the child of changing its parental status:

We consider the argument that a parent is unable to adequately care for the child if the child's welfare would be harmed by uprooting its present custody to be inapplicable because the child on November 11, 1969 [the date of the initial judgment], had only been in the temporary custody of the foster parents for a short time. *State ex rel. Lewis v. Lutheran Social Services, supra,* at 12, 207 N.W.2d at 832.

The court was therefore explicitly not deciding the meaning of the "best interests of the child" standard in the context at hand, i.e., where the biological parent has

consented to adoption, the adoptive parents have been awarded preadoption custody, and the biological parent seeks to withdraw that consent. In fact, the *State ex rel. Lewis* court stated: "But we think it would be inappropriate for this court to presently decide any preference of fitness or unfitness or give any indication of where the 'best interests' of the child lie until that issue is ripe for determination." *State ex rel. Lewis v. Lutheran Social Services, supra,* at 10, 207 N.W.2d at 831.

The *State ex rel. Lewis* court remanded the matter to the trial court with an order to hold a hearing and provide for notice and opportunity to be heard to the appropriate parties including the putative father. It is significant that in light of the supreme court order, the trial court held a hearing providing for appropriate due process rights and ordered custody of the child to remain with the adoptive parents.

The trial court in this case also relied on two other Wisconsin cases, *LaChapell v. Mawhinney,* 66 Wis.2d 679, 225 N.W.2d 501 (1975), and *Lacher v. Venus,* 177 Wis. 558, 188 N.W. 613 (1922). In *LaChapell,* the supreme court reversed the trial court's decision awarding custody to the natural parent. Although the trial court found as a matter of fact that the natural parent had abandoned the children, the trial court ruled that it had no choice but to award custody to the natural parent unless it could find him to be unfit or unable to care for the children. The supreme court disagreed, stating:

As a general matter, but not invariably, the child's best interest will be served by living in a parent's home. However, if circumstances compel a contrary conclusion, the interests of the child, not a supposed right of even a fit parent to have custody, should control. *LaChapell v. Mawhinney, supra,* at 683, 225 N.W.2d at 503.

The *LaChapell* case is easily distinguished; it involved a custody dispute under Chapter 247 of the Wisconsin

Statutes and not adoption under Chapter 48. Custody cases are different from parental termination cases because, in the former, the "best interests of the child" standard constitutes an important factor, but it is not the controlling factor. *State ex rel. Lewis v. Lutheran Social Services, supra,* at 9, 207 N.W.2d at 831. When faced with a custody dispute between two natural parents, our court uses the standard of ending parental custody only upon a finding that the parent is unfit. *Ponsford v. Crute,* 56 Wis.2d 407, 202 N.W.2d 5 (1972). Significantly, this case involves termination of parental rights where in the controlling standard is entirely dissimilar.

Furthermore, our review of the *LaChapell* case indicates that it stands for the proposition that the best interests of the child—not the supposed rights of parents to custody—should control.

In the *Lacher* case, the other case cited by the trial court, the court held that natural parental rights could not be terminated without notice and opportunity to be heard. In so ruling, the court found an inherent right in the family relationship which cannot be terminated except "by due process of law." *Lacher v. Venus, supra,* at 570, 188 N.W. at 617.[4]

---

[4] The quote relied upon by the trial court reads:

A natural affection between the parents and offspring, though it may be naught but a refined animal instinct and stronger from the parent down than from child up, has always been recognized as an inherent, natural right, for the protection of which, just as much as for the protection of the rights of the individual to life, liberty, and the pursuit of happiness, our government is formed. We trust that it will never become the established doctrine that the state shall say to the parents, and particularly to the mother, she who doth travail, and in great pain bring forth her child and after labor doth rejoice that the child is born, that there is but a mere privilege and not a right to the subsequent affection, comfort, and pride of and in such child. *Lacher v. Venus,* 117 Wis. 558, 569–70, 188 N.W.2d 613, 617 (1922).

The *Lacher* case turned in part upon a property right of the natural parents to their offspring. It cannot be doubted that under present case law, no such property right exists. *See, e.g., In re Adoption of Morrison,* 260 Wis. 50, 49 N.W.2d 759 (1951), *reh. denied,* 260 Wis. 69a, 51 N.W.2d 713 (1952). While this court does not contest the right of a natural parent to notice of termination of parental rights, parents do not "own" their children.[5] The modern-day concept of the "best interests of the child" is inconsistent with any such property right.

The contemporary standard controlling adoption proceedings is best illustrated by Wisconsin case law which was not considered by the trial court. In *In re Adoption of Morrison, supra,* at 59, 49 N.W.2d at 763, for example, the supreme court held that where the natural mother voluntarily and freely consents to adoption, she may not, after the adoptive parents have acted upon that consent, arbitrarily withdraw her consent to adopt. *In re Adoption of Morrison, supra,* at 62–63, 49 N.W.2d at 765, quoting *Wyness v. Crowley,* 292 Mass. 461, 464, 198 N.E. 758, 759 (1935). The court in *In re Adoption of Morrison* also dealt with the right of the illegitimate father and the guardian ad litem to participate in the adoption. While not material here, the court in *In re Adoption of Morrison* set aside the trial court's judgment decreeing adoption because of the failure of the trial court to gain the concurrence of the guardian ad litem. *In re Adoption of Morrison, supra,* at 69, 49 N.W.2d at 768. On remand, the trial court again ruled in favor of the adoptive parents. In a subsequent appeal to the Wisconsin Supreme Court, the court affirmed. *In re Adoption of Morrison,* 267 Wis. 625, 66 N.W.2d 732 (1954).

In the first *In re Adoption of Morrison* decision, the court construed the best interests of the child standard

---

[5] *State ex rel. Lewis v. Lutheran Social Services, supra* note 3.

stating: "The primary and paramount consideration in construing the adoption statutes is the welfare of the child and the so-called rights of the natural parents are subordinate thereto." *In re Adoption of Morrison, supra,* at 59, 49 N.W.2d at 763; *see* sec. 48.01(2), Stats. *See also* notes 3–4. The above language from *In re Adoption of Morrison* represents the proper priority of values in adoption proceedings—the best interests of the child are paramount, and the rights of natural parents must be subordinated to that primary right. Section 48.01(2), Stats., the introductory portion of the Children's Code, supports this view:

(2) This chapter shall be liberally construed to effect the objectives contained in this section. The best interests of the child shall always be of paramount consideration, but the court shall also consider the interest of the parents or guardian of the child and the interests of the public.

This construction is also supported by experts in the field of child development. An example of research in the area is Goldstein, Freud, and Solnit's, *Beyond the Best Interests of the Child,*[6] an often-cited treatise on the subject. In that book, the authors propose that once children have established homes with adoptive parents and the adoptive parents have then become the "psychological parents" of the child, the child should not be uprooted because of the "rights" of the biological parents.[7] Rather than a "best interests of the child" standard, the authors advocate the "least detrimental alternative"

[6] Goldstein, Freud, Solnit, *Beyond the Best Interests of the Child* (1973). *See also, The Adoption of Baby Lenore: Two Interpretations of a Child's Best Interests,* 11 J. of Family Law 285, 305 (1971); *Adoption: Psychological Parenthood as the Controlling Factor in Determining the Best Interests of the Child,* 26 Rutgers L. Rev. 693 (1973).

[7] *Beyond the Best Interests of the Child, supra* note 6, at 17–20.

standard.[8] Proper placement of the child in contested adoption proceedings under the standard should be viewed from the perspective of doing the least possible psychological harm to the child. Potential harm can be avoided by not separating the child from its "psychological parents." In discussing their proposed standard, the authors state:

Even though we agree with the manifest purpose of the "in-the-best-interests-of-the-child" standard, we adopt a new guideline for several reasons. First, the traditional standard does not, as does the phrase "least detrimental," convey to the decisionmaker that the child in question is already a victim of his environmental circumstances, that he is greatly at risk, and that speedy action is necessary to avoid further harm being done to his chances of healthy psychological development. Secondly, the old guideline, in context and as construed by legislature, administrative agency, and court, has come to mean something less than what is in the child's best interests. *The child's interests are often balanced against and frequently made subordinate to adult interests and rights.* Moreover, and less forthrightly, many decisions are "in-name-only" for the best interests of the specific child who is being placed. [Emphasis added.] *Beyond the Best Interests of the Child, supra,* at 54.

The Wisconsin Supreme Court accorded footnote recognition to *Beyond the Best Interests of the Child* in *In re Z.,* 81 Wis.2d 194, 202, 260 N.W.2d 246, 250 (1977). In that case, the trial court refused to disturb the adoptive parents' custody of the child Z. The Wisconsin Supreme Court affirmed. In so ruling, the supreme court cited *Beyond the Best Interests of the Child* in two separate footnotes. In one note, the court discussed the least detrimental alternative standard. *In re Z., supra,* at 202 n. 3, 260 N.W.2d at 250 n. 3. The second note implied strongly that adult rights, biological or otherwise, are

---

[8] *Id.* at 53–65.

not of primary concern in adoption proceedings. The court, commenting upon the introductory section to the Children's Code, sec. 48.01(3), Stats., indicated that:

The legislature envisaged that the interests of the children could in some circumstances conflict with the interests of a parent or guardian, but those conflicts are clearly to be resolved, not in favor of the parent or guardian, but in favor of the interests of the children. [Footnote omitted.] *In re Z., supra,* at 203, 260 N.W.2d at 251.

In an accompanying footnote the court said: "The language of the Wisconsin legislature in this respect allays the fears of the authors of 'Beyond the Best Interests of the Child' that, in all cases, '. . . laws are made by adults for the protection of adult rights.'" *In re Z., supra,* at 203 n. 4, 260 N.W.2d at 251 n. 4, quoting *Beyond the Best Interests of the Child, supra,* at 106.

The controlling Wisconsin case law, the statutes and the classic work on the subject all emphasize the child's best interests and the necessity for relegating adult or parental rights to that interest. In the opinion of this court, there is no room in such a construction for a presumption favoring natural or biological parenthood.

In ruling as we do, we are mindful that there is somewhat of a split of authority among the other jurisdictions and that some jurisdictions find a presumption in favor of the natural parents. Our review of these cases indicates, however, that the modern trend is in accordance with the "best interests of the child" standard contained in the Wisconsin statutes and reflected in Wisconsin case law which requires that the primary focus be on the child. *See generally,* Annot., 74 A.L.R.3d 421, 433–34 (1976). While "blood ties" are not irrelevant, they do not under Wisconsin law rise to the stature of a presumption.

■

The trial court erred in according a presumption to the natural mother. The evidence in this case therefore must be reviewed to determine whether, without such a presumption, the petitioner offered sufficient evidence to carry her burden that the "best interests of the child would be furthered" by allowing her to revoke her consent to adopt.

### B. The Expert Testimony

There was a conflict in the expert testimony offered at trial concerning the best interests of the child. Dr. Maria Piers, a child development professor from the Erickson Institute of Loyola University of Chicago, and Dr. William Offenkrantz, a psychiatrist from the Medical College of Wisconsin, testified on behalf of the adoptive parents. Dr. John Liccione, chief psychologist at the Milwaukee Mental Health Complex and an expert in child psychology, and Dr. Robert Goerke, Ms. Riordan's personal psychiatrist, testified on behalf of the biological mother.

Dr. Maria Piers had unquestionable qualifications as an expert in the field of child psychology. She was dean of the Erickson Institute for Early Education at Loyola University from 1966 to 1977. At the time of the consent revocation hearing, she served at that institute as a distinguished service professor.

After spending time examining R.P.R. in his environment with the adoptive parents, Dr. Piers testified that the child would be severely traumatized by being separated from his psychological parents, the Brandts. This "separation trauma" would be exacerbated by the fact that R.P.R. was eight months old at the time. At that age, the child had developed an acute awareness of who his parents were in a psychological context. Additional-

ly, the child had developed "stranger anxiety" which is a fear of strangers suffered by children after the age of six months. The peculiar time concept of a child the age of R.P.R. would also aggravate the separation. According to Dr. Piers:

I mean an eight-month old or indeed an older [child], say a two-year-old, cannot project into the future and a brief separation may seem endless because he cannot forsee [*sic*] that things will eventually straighten out or that he will indeed have a good place elsewhere or indeed that his parents will come back and take care of him, and his strange environment but particularly any strange person, is perceived much more keenly and they cannot tell themselves at this age, as we [adults] might for instance, . . . in two days or in three days or in six weeks my friend, my husband, my parent, my child will be restored to me.

Dr. Piers also testified that the child would be extremely confused by the prospective name change should permanent custody of R.P.R. be transferred to Ms. Riordan; the child had been named "Andrew" by his adoptive parents while the natural mother planned to call him "Ryan."

The short term effects of this "separation trauma" were described by Dr. Piers as follows:

I think one has to anticipate disturbances in feeding, in his appetite, possibly in his sleep, and I mean altogether in his physical, physiological functioning which is also different from us when we have to separate from somebody we love; we may temporarily lose our appetite if it is very serious, if a person dies, for instance, but on the whole we have our coping equipment together and we recover. With an eight-month old there is no guarantee; it can happen, but it doesn't have to happen.

Although Dr. Piers could not testify to a reasonable degree of medical certainty concerning long-term effects, she did testify that the short-term effects of separation trauma would have a severe emotional and physical effect on the child.

Dr. John Liccione, who testified for the natural mother, is an expert in the field of child psychology and child development. At the time of the consent revocation hearing, he had twenty-six years of experience in the field of child psychology. He specialized in children and adolescents. Although he had not previously testified in an adoption proceeding, he had vast experience evaluating and testifying concerning custody matters in divorce proceedings.

Dr. Liccione's conclusion was that R.P.R. should be transferred to the biological mother. His rationale was described as "rejection trauma." According to Dr. Liccione, adopted children suffer "identity crises" and question their adoptive parents about the natural parents and the reasons why they were adopted. In this situation, the crisis suffered by R.P.R. would be aggravated should he discover that his adoptive parents rebuffed an attempt by the biological mother to gain custody. According to Dr. Liccione, this discovery would cause great tension in the relationship between the adoptive parents and the child. He said:

The anguish and agitation and hostility would not be a shortlived occasion. It would be a torment between the child and the adoptive parents. It would seriously disrupt the relationship between child and parents and would be generally traumatic for him.

When questioned concerning separation trauma, he testified that although there would likely be "a period of readjustment where the child would be upset . . . ," there would be no permanent damage. Dr. Liccione concluded that the rejection trauma would far outweigh the separation trauma.

Dr. Piers, when asked about the rejection trauma, testified that there was no empirical evidence of rejection trauma. She also indicated that there was no quantitative study concerning rejection trauma. She testified

that rejection trauma was only conjecture while separation trauma was proven to be frequently damaging to children the age of R.P.R. Dr. Liccione admitted that there was no empirical data to support his theory of rejection trauma. Further, he had no personal quantitative study which would provide credibility to his theory.

The elements of admissible expert testimony are: (1) the subject is distinctively related to some science, profession, business or occupation and therefore beyond the realm of the average layman; (2) the expert has sufficient skill in the area to aid the trier of fact in his search for the truth, and (3) the state of the pertinent art or scientific knowledge in the subject is sufficiently developed to allow a reasonable opinion to be asserted by an expert. D. McCormick, *Law of Evidence*, §13, p. 29–31 (2d Ed. 1972). *See* secs. 907.02 and 907.03, Stats. Dr. Liccione's testimony concerning rejection trauma fails to satisfy the third element of admissible expert testimony. The rejection trauma theory is baseless conjecture unsupported by any documentary evidence or treatise on the subject.[9] As such, the opinion should not have been allowed into evidence as a matter of law since it is impermissible to base a finding on conjecture, unproved assumptions or mere possibilities. *Merco Distributing Corp. v. Commercial Police Alarm Co., Inc.*, 84 Wis.2d 455, 461, 267 N.W.2d 652, 655 (1978). As the supreme court stated in *Puhl v. Milwaukee Auto. Ins. Co.*, 8 Wis. 2d 343, 353–54, 99 N.W.2d 163, 169 (1959):

When scientific or medical theories or explanations have not crossed the line and become an accepted medical fact, opinions based thereon are no stronger or convincing than the theories. While this court has gone a long way in admitting expert testimony deduced from well-

---

[9] Holz, *A Survey of Rules Governing Medical Proof in Wisconsin—1970*, 1970 Wis. L. Rev. 989, 1005, *citing Selleck v. City of Janesville*, 104 Wis. 570, 80 N.W. 944 (1899).

recognized scientific and medical principles or discoveries, nevertheless, the facts from which the opinion is made must be sufficiently established to have gained general acceptance in the particular medical field in which they belong. Otherwise, the opinion is based not on facts but conjecture.

On the other hand, separation trauma, as testified to by Dr. Piers, is supported by a plethora of psychological studies done on the subject.[10] In addition, the courts have acknowledged separation trauma in Wisconsin and in other jurisdictions.[11] In *Adoption of Tachick*, 60 Wis. 2d 540, 210 N.W.2d 865 (1973), for example, the Wisconsin Supreme Court reversed the trial court finding that too little weight had been accorded to the fact that the child had lived from birth with the natural grandparents who were seeking to adopt the child. In discussing the trauma attendant upon separating the child from that environment, the court stated:

The literature on the problem of separation trauma of a young child is vast and interesting. It is stated the important thing is not the mother in a biological sense but the mother figure, for it is the mother figure with which the child becomes totally identified and it is the mother figure whoever tnat might be that the child constantly turns to for nourishment, and other physical comforts, love and security. It is stated that separation during the early years of an infant's life from the mother figure causes apprehension, depression, withdrawal, and rejection of environment, slow movement, and stupor, anorexia, and weight loss, insomnia, eczema, and res-

[10] *See* note 6; *Adoption of Tachick*, 60 Wis.2d 540, 554 nn. 9 and 10, 210 N.W.2d 865, 872 nn. 9 and 10 (1973).

[11] *In re Z.*, *supra* note 2; *In re Termination of Parental Rights to Kegel*, *supra* note 2; *In re Guardianship of Schmidt*, 71 Wis.2d 317, 328, 237 N.W.2d 919, 924 (1976); *Adoption of Randolph*, *supra* note 1, at 69–75, 227 N.W.2d at 637–40; *In re Adoption of One Child*, 154 N.J. Super. 513, 381 A.2d 1232 (1977); *In re Adoption of Child by P.*, 114 N.J. Super. 584, 277 A.2d 566 (1971); *In re Adoption of Gibson*, 239 N.W.2d 540 (Iowa 1976).

piratory infections, and continued separation may bring on further withdrawal, persistent autoerotic activity, frozen rigidity, catatonia and cachexia. It is perhaps this separation trauma that causes an adoption agency to place children for adoption as soon as possible. However, many children are placed in foster homes prior to adoption and the degree and duration of the trauma of separation depends on many factors. [Footnotes omitted.] *Adoption of Tachick, supra,* at 554–55, 210 N.W.2d at 872.

We have earlier discussed *In re Z.,*'s recognition of the book, *Beyond the Best Interests of the Child,* in relation to our rejection of the trial court's presumption favoring natural parents. We also believe that *In re Z.*'s recognition of the book is important in our discussion relating to the credibility of separation trauma as opposed to rejection trauma. In one note, the court supported the decision of the trial court to leave the child with the adoptive parents stating:

The trial judge, in effect, followed the precept stated by Goldstein, Freud and Solnit in *Beyond the Best Interests of the Child,* ". . . decisionmakers . . . task is to salvage as much as possible out of an unsatisfactory situation" . . . or, as that volume urges, to make the placement choice "least detrimental" to the child from among the then available alternatives. *In re Z., supra,* at 202 n. 3, 260 N.W.2d at 250 n. 3.

That language is recognition that the "best interests of the child" standard is often best satisfied by avoiding the trauma resulting because of separation from the psychological parents—in effect, utilizing the "least detrimental alternative." In this case, the competent expert testimony indicated that severe trauma would be suffered by R.P.R. upon separation from his psychological parents.

This court will not engage in a judgment of the relative qualifications of the testifying experts at the trial.

Dr. Liccione and Dr. Piers were qualified to give expert testimony in the area. The separation trauma theory offered by Dr. Piers, however, is supported by empirical data and firmly established in the literature on the subject. Dr. Liccione's rejection trauma theory is speculative and undocumented. The trial court erred in allowing Dr. Liccione's theory into evidence and relying upon it in its decision.

Considering the testimony at trial without the presumption and without the testimony of Dr. Liccione, there is no evidence in the record to support the biological mother's burden of proof by a preponderance of the evidence that the best interests of R.P.R. would have been furthered by allowing her to revoke her consent.

## III. POLICY REASONS AFFECTING PARENTAL CONSENT TO ADOPTION

The general statutory rule is that parental consent to adoption is "irrevocable." Sec. 48.84(2)(a), Stats. A statutory exception to that rule provides that before the entry of the adoption order, consent may be withdrawn if "the best interests of the child would be furthered thereby." Sec. 48.86, Stats. The Brandts claim that by allowing Ms. Riordan to withdraw her consent in this case the trial court in effect made the exception the general rule; that if the trial court's rationale were affirmed, the general rule would be that consent to adoption would be revocable. Such a construction of secs. 48.84 and 48.86, Stats., they argue, would undermine the irrevocable nature of consent under sec. 48.84 and would be contrary to the policy expressed by the legislature.

In particular, the Brandts point to the fact that Ms. Riordan did not show cause for revocation of consent. They claim the trial court allowed her to revoke her consent upon a "whimsical change of mind." In this regard, the Brandts' argument is misdirected. Whether

Ms. Riordan had a sudden change of heart or whether her change of heart was "whimsical" is generally irrelevant under sec. 48.86, Stats. Her state of mind is relevant only when, in a limited sense, it illustrates that "the best interests of the child would be furthered" by revocation of consent.

In a broader sense, the Brandts' argument is well taken. The trial court's rationale in this case would completely undermine the stability of adoption proceedings. The court's presumption favoring natural parents in adoption proceedings, as well as Dr. Liccione's "rejection trauma" theory, would effectively give the natural parent arbitrary veto power over an adoption before the entry of the final order. Anytime biological parents wanted to revoke consent before the entry of the final order they could merely rely upon their "blood ties" to the child or upon the theory that the child would "reject" the adoptive parents if the attempt to regain custody was denied.

We agree with the Brandts that the trial court's rationale emaciates the generally irrevocable nature of consent in adoption and is thus contrary to public policy. In so deciding, we are mindful that the general policy is to promote the stability of adoption proceedings which underlies the generally irrevocable nature of adoption.

The trial court's order allowing revocation of consent was an abuse of discretion and is therefore reversed.

*By the Court.*—Order reversed.